Filed 12/11/18

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| JOHN DOE, | B271834 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. BS152306) |
| v. | |
| UNIVERSITY OF SOUTHERN CALIFORNIA, | |
| Defendant and Respondent. | |

APPEAL from the judgment of the Superior Court of Los Angeles County, Joanne B. O'Donnell, Judge.  Reversed and remanded.

Werksman Jackson Hathaway & Quinn, Mark M. Hathaway, Mark W. Allen and Jenna E. Eyrich for Plaintiff and Appellant.

Gibson, Dunn & Crutcher, Theane Evangelis, Lauren M. Blas and Gregory S. Bok for Defendant and Respondent.

_____

John Doe appeals from the trial court's denial of his petition for a writ of administrative mandamus to set aside his expulsion from the University of Southern California (USC) for unauthorized alcohol use, sexual misconduct, sexual assault, and rape. USC student Jane Roe[1] submitted a complaint to USC alleging John had sexually assaulted her in Jane's apartment after they both attended a "paint" party, at which the students splattered paint on each other. Dr. Kegan Allee, the Title IX[2]

---

[1] We identify the parties by the pseudonyms "John Doe" and "Jane Roe," as used by the parties, to protect their privacy. For ease of reference, we refer to John Doe and Jane Roe in this opinion as John and Jane, and refer to the student witnesses by their first names to protect their identities.

[2] Title IX of the Education Amendments of 1972 (20 U.S.C. § 1681 et seq.) (Title IX), applicable to universities receiving any federal financial assistance, requires institutions of higher education to address discrimination on the basis of sex. These requirements have been applied to require universities to investigate allegations of sexual misconduct involving students. A student may bring a Title IX claim against a school for sexual harassment by another student where the harassment "is so severe, pervasive, and objectively offensive that it effectively bars the victim's access to an educational opportunity or benefit," and "the funding recipient acts with deliberate indifference to known acts of harassment in its programs or activities." (*Davis v. Monroe County Bd. of Ed.* (1999) 526 U.S. 629, 633; accord, *Gebser v. Lago Vista Independent School Dist.* (1998) 524 U.S. 274, 283 ["sexual harassment can constitute discrimination on the basis of sex under Title IX"].) Sexual assault "qualifies as being severe, pervasive, and objectively offensive sexual harassment that could deprive [plaintiff] of access to educational opportunities provided by her school." (*Soper ex rel. Soper v. Hoben* (6th Cir. 1999) 195 F.3d 845, 855; accord, *Lopez v. Regents*

2

investigator, who served as the investigator and adjudicator of the complaint pursuant to USC's administrative guidelines, found by a preponderance of the evidence John knew or should have known Jane was too drunk to consent to sexual activity. In addition, Dr. Allee concluded even if Jane had consented to vaginal sex, she had not consented to anal sex, as evidenced by blood observed in her apartment on the mattress, sheets, and carpeting later that day by Jane and another student.

John contends on appeal he was denied a fair hearing. We agree. Dr. Allee did not interview three central witnesses, including the two witnesses who observed Jane's apartment after the sexual encounter—one described a large puddle of blood on the mattress and blood on the sheets and carpeting; another saw the apartment earlier that day and did not see any blood. Jane relied on the third witness to help her reconstruct what happened the morning of the incident. Instead, Dr. Allee relied on the summary of the interviews by another Title IX investigator, Marilou Mirkovich. Accordingly, Dr. Allee was not able to assess the credibility of these critical witnesses during the interviews.

Because Dr. Allee's investigative report and adjudication turned on witness credibility, Dr. Allee should have interviewed all critical witnesses in person or by videoconference to allow her to observe the students during the interview. This was especially important here where there were inconsistencies in the testimony and a dispute over whether the substances observed in Jane's apartment after the sexual encounter were blood or paint from the paint party. In addition, USC did not comply with its own procedures to conduct a fair and thorough investigation by failing

*of the University of California* (N.D.Cal. 2013) 5 F.Supp.3d 1106, 1124.)

to request that Jane provide her clothes from the morning of the incident and her consent to release her medical records from the rape treatment center.

We reverse and remand to the trial court with directions to grant John's amended petition for a writ of administrative mandamus.

## FACTUAL AND PROCEDURAL BACKGROUND

A.    *Events Prior to the Incident*

On April 12, 2014 Jane and Sarah went to Jane's apartment to get ready for two parties they planned to attend that evening.[3]  While they were at Jane's apartment, they each had one beer and possibly shared a second beer.  Each of them had one shot of alcohol at the first party.  They then went to Sarah's apartment around 9:30 p.m., and Jane and Sarah began drinking honey whiskey shots.  Sarah reported she and Jane may have had three shots each while at Sarah's apartment.  Jane stated she did not drink more than two or three shots.  Around 10:00 p.m. Carter arrived at Sarah's apartment, followed by John.  John was Carter's friend from the same hometown. Around 11:00 p.m. Emily joined the group.

The group walked over to the paint party together.  At the party, the attendees splattered each other with jugs of paint. Sarah stated there was a lot of red paint at the party, and she

---

[3]    We summarize the facts from the administrative record, including the interview summaries prepared by the Title IX investigators, the cell phone records submitted by Jane, the written statement provided by Jane's friend J.D., the USC Department of Public Safety report, and the Los Angeles Police Department investigative report.

4

had red paint behind her ears and on her body for days after the party. Sarah reported the day after the party the red paint looked like "bruises and blood." Sarah and Jane shared a drink at the party. Emily observed Jane was "very flirty," putting her arms around young men and sitting on their laps. Jane sat on Austin's lap, which Sarah thought was "weird" because Austin was "creepy" and "older." Emily saw John with his arm around Jane. Jane told Dr. Allee, "[John] was apparently always around me all night. I remember there was a long-haired person always near me with a USC shirt."

Carter told Dr. Allee that John was with him at the party most of the night because John did not know the other students. Carter described Jane, John, and Sarah as "very drunk." Carter explained that before the party Jane "was very quiet and reserved, but later at the party she was doing stuff that was totally not like her." He said it would have been obvious she was "really drunk" because she was having difficulty walking, "[s]he was hanging on people a lot," sat on a strange male's lap, and was waving her drink around. But she spoke in full sentences and did not have slurred speech. He did not see Jane fall down, although he only saw her "at random times." Carter described himself and Emily as being only "tipsy."

Vance was a friend of Andrew, whom Jane was dating. Vance told Dr. Allee that Jane "was very drunk" at the party. Jane tried to dance with Vance, but "[s]he fell down a couple of times." He saw Jane fall down three times towards the end of the party: first when she threw buckets of paint on other people; then when she was dancing with a group; and a third time when she was outside on the street curb with two female friends.

Jane also described herself as intoxicated and falling down. She told Dr. Allee, "I lost complete control of that 3rd eye that I

5

always [had] to be aware of how intoxicated I am." She added, "The next day my tailbone super hurt and my back felt thrown out."

At 1:49 a.m. the next day Jane sent a text to Andrew, stating, "Vance is helping me walk home [¶] Help."[4] At 2:04 a.m. she added, "Blackout [¶] Vance helped." Then at 2:40 a.m. she texted, "Sort of [¶] He seems okay with i[t] all. . . ." Vance later told Jane he remembered another male was with Jane and Sarah, but he did not know who it was.

At the end of the party, Jane, Sarah, Emily, Austin, Carter, and John left the party together. As they were leaving, Carter saw Jane "hanging on" to Sarah and John. Carter and Emily walked ahead of the group. Emily described Jane as "very drunk," but she was walking "ok." At some point Carter left to walk to his apartment, and Emily rejoined the group.[5]

Jane walked back to her apartment with John. Emily and Sarah went to Sarah's apartment so Emily could charge her phone. At 2:14 and again at 2:55 a.m. Jane sent texts to Emily and Sarah to inquire whether they were coming back to her apartment. Emily responded that they were looking for Sarah's phone, and asked if Jane was with John. Jane responded that she was. Emily and Sarah later walked to Jane's apartment to use Jane's computer to track down Sarah's cell phone.

---

[4] According to Vance, he offered to walk Jane home, but Sarah told him firmly he was not needed. Although Jane texted Andrew that Vance walked her home, it is undisputed John walked Jane to her apartment.

[5] The record does not reflect when Austin left the group.

6

B.    *The Incident*

Emily and Sarah arrived at Jane's apartment about 3:30 a.m. on April 13, 2014.[6]  Emily opened Jane's apartment door without knocking.[7]  When Emily and Sarah walked into the apartment, Jane and John were naked on the air mattress in the living room.  Emily stated John did not cover himself; he remained on the air mattress completely naked.  Sarah saw "two dark figures" on the air mattress, but she did not know the second person was John.  The lights were off, and Sarah did not see paint around the air mattress.  When Emily asked to use Jane's computer, Jane became "frantic" and could not find the computer, even though it was in plain view.  After Emily picked up the computer, Jane guided her out the front door.  Emily heard the door locking and assumed Jane locked the door because she had led Emily out.  Jane told Dr. Allee that John had said, "Lock the door."  Emily and Sarah sat outside Jane's apartment door trying to use the computer.  At 3:36 a.m. Emily sent a text message to Jane saying they had left the computer outside Jane's apartment.  Emily and Sarah returned to Emily's apartment.

Jane described the sexual encounter to Dr. Allee:  "I blacked out.  My friends came to my apartment and found me having sex with John.  I was nervous.  Agitated, but I can't remember why.  He was having sex with me but I wasn't responding back.  He flipped me over and pushed my head down.

---

[6]    Security video footage from the elevator showed Emily and Sarah exiting the elevator to Jane's floor at 3:31 a.m., then reentering the elevator from Jane's floor at 3:38 a.m.

[7]    Jane kept her door unlocked because she lived at the end of a hallway, and it was not apparent there was an apartment there.  Sarah stated it was normal for Emily and her to walk into Jane's apartment without knocking.

He entered me from behind.  That was really painful!  The only thing I remember saying was 'condom' because I was probably really nervous he wasn't using one.  Pain pulled me out of the black out.  I was in so much pain."  Jane added, "The most vivid memory is the pain from the anal intercourse.  I shouted from [the] pain.  I'm pretty sure it was loud.  There was aggression to make him stop."  After the encounter Jane went to her bedroom to hide.  According to Jane, John came in and told her, "I crossed a boundary," and left the apartment.  Security footage from the elevator showed John entering the elevator from Jane's floor at 3:57 a.m.

Dr. Allee asked Jane if she had sensory memories from that night.  Jane responded, "Yeah, I have a lot of those.  I currently can't smell alcohol without throwing up.  I can't be touched below my torso without freaking out.  I have this terrible panic if someone hugs me without telling me.  I remember the sensation of throwing up the rice, but not where or how.  I remember the light when my friends opened the door to the apartment.  I remember the pain of the flipping me over.  Most of the memories come from Emily.  Sarah wasn't unconscious but behaving very strangely, which is why Emily was focused on her."

At 3:49 a.m., after John left the apartment, Jane sent a text message to Emily: "[I]s [Sarah] okay?!? [¶]  Fuck [¶]  I was so drunk [¶]  Ow [¶]  That wasn't what I wanted."  Jane then texted, "I was taken advantage of but it's fine" and "It happens."

At 4:00 a.m. Jane called J.D., a high school friend who lived in a different state.  J.D. provided Dr. Allee a written statement describing his conversation with Jane:[8]  "[Jane] was crying when

---

[8]    J.D. told Dr. Allee he wrote the statement the same morning after he spoke with Jane a second time and realized she did not remember their 4:00 a.m. conversation.

I picked up and she disclosed she had had a very bad sexual encounter and she wasn't really sure how everything had happened. She said that it hurt a lot and she was still in pain. She kept apologizing through tears and I told her that she had nothing to apologize for and there was nothing she had done wrong. She had met him at the party and she couldn't remember his name. . . . They had walked in on [her] and the guy having sex, but they didn't realize what was going on and she couldn't communicate it. She couldn't remember if she had verbally consented to anything or not and I said it didn't matter because she was obviously intoxicated and she had told me that she even threw up before he hooked up with her. She was disoriented and panicked and was embarrassed because she couldn't really remember what happened between the party and her apartment or how the guy had come back with them. She had made him leave the apartment some period of time prior to the conversation, and she said she was really scared and had locked the door of her apartment."

At 9:21 a.m. Jane called J.D. again after seeing his text message telling her to call him. J.D. stated, "When she called the next morning, she was really struggling to remember the chronology of events and had completely forgotten that she had thrown up. . . . She still didn't remember his name and could only vaguely remember walking back, with no idea how he joined their party. She then disclosed to me that there was blood on the sheets and mattress and they were freaking her out but she wasn't sure what to do about them. This alarmed me for obvious reasons and I believe it was at this point she disclosed to me that they had had anal intercourse. She was still in some discomfort. . . . Later, [Jane] called me in a panic saying that she had found the guy's wallet in her apartment and was really

9

scared he was going to come back for it and she wasn't sure what to do or whether to bring it to the rape clinic. We decided she should take it."

Jane told Dr. Allee that when J.D. reminded her she had told him she threw up, she "remembered the feeling of throwing up the rice." Jane found a bowl of rice in the kitchen. Jane told Dr. Allee she was covered in blood in her rectal area and on her thighs. She put on a maxi dress to cover the blood and paint, and wiped the paint off her face before she went outside. Jane found a condom with fluids and put it in a bag, but she was concerned it might have belonged to Andrew. Jane put all the clothes she had been wearing into another bag.

On the morning of April 13 Sarah went to Jane's apartment. When she arrived, Jane was on the phone, dressed in a maxi dress. Sarah did not remember seeing blood or paint on the floor or mattress, but thought the air mattress was gone and the apartment "looked really empty" and "seemed cleaner." Sarah collected her belongings from the night before and left the apartment after about five or 10 minutes.

Andrew did not attend the paint party. He fell asleep around 2:00 a.m., then woke up about 10:30 a.m. He had received text messages from Jane throughout the night. He spoke with Jane and deduced she had been assaulted after she told him she could not change her clothes or drink water. Later that day Andrew had a previously scheduled lunch with Vance. At lunch, Andrew asked Vance about the party and learned that someone was "hanging" around Jane. Vance told Andrew that Jane had been "unusually intoxicated" at the party and he had seen her fall down.

Although John did not provide a statement, Carter relayed to Dr. Allee what John told him on April 13. When Carter woke

10

up that morning, he saw text messages from John saying he was worried because Jane "was freaking out."[9]  John called Carter later that day while Carter was on his way home.  Carter told Dr. Allee, "[John] told me that they got back to her apartment. They were making out and she was like 'do you have a condom?' He didn't know it would go that far.  He asked if it was okay and she said, 'don't ask, just do it.'  They started having sex, and I don't know why John did this.  She flipped over so he thought she wanted to have anal sex.  So he did and she flipped out like any girl would.  She threw stuff at him and was yelling.  He asked me what he did wrong and I said, 'of course you did something very wrong.' . . .  He asked permission.  He's very polite."

Carter recounted that John asked permission to have sex, but not anal sex "because she seemed turned off when he asked the 1st time."  John said he immediately stopped when Jane told him to, then left the apartment.  Carter added, "[John] said he didn't see blood.  He was very confused when he heard that." John told Carter Jane was never bleeding.

C.     *Jane's Visit to the Rape Treatment Center*

About 11:00 a.m. on April 13 two USC Department of Public Safety (DPS) officers drove Jane to the Santa Monica-UCLA Medical Center, Rape Treatment Center (rape treatment center).  Jane told the officers she had been sexually assaulted by an acquaintance around 2:00 a.m. that day, and she had been drinking.  When two Los Angeles Police Department (LAPD) officers arrived at the rape treatment center, Jane told them she did not want to speak about the incident or make a report.  Jane

---

[9]     Carter told Dr. Allee he no longer had the text messages because he got a new cell phone.

11

was seen by a psychologist and a nurse practitioner. The center obtained a SART kit[10] from the examination, but Jane did not want to release the kit to the LAPD officers.

Jane told Dr. Allee she was "freaked out" by the DPS officers and was overwhelmed when the male LAPD officers came to the rape treatment center because she did not want to look at any males. Jane was at the rape treatment center from approximately 12:30 to 4:30 p.m. While Jane was there, John texted her at 3:38 p.m. and asked, "Hey I think I might've left my wallet at your place, have you seen it around?" Jane did not remember giving John her cell phone number and did not reply.

D.    *Subsequent Events*

On the afternoon of April 13 Andrew picked Jane up from the rape treatment center. It was not until then that Jane opened John's wallet and saw his name. Andrew and Jane went to the police station, and Andrew dropped off the wallet, saying he found it on the street. At 4:25 p.m. Jane texted J.D. to say, "I look like a battered convict. Mostly because the paint looks like bruises. And I'm in [an] all grey sweatsuit."

Jane and Andrew next went to Jane's apartment. Only Andrew went inside; Jane waited in the hallway. Mirkovich summarized her interview with Andrew: "He stated that when he walked in, he 'realized that everything was disheveled'—there was a basket of clothes strewn about and 'throw-up.' Then he noticed that [there were] puddles of blood on the air mattress,

---

[10]    A sexual assault response team (SART) kit is collected by a medical practitioner and typically contains the results of a sexual assault examination or evidence collected in response to an alleged sexual assault. (See *People v. Uribe* (2008) 162 Cal.App.4th 1457, 1463.)

which were about 6 inches in size, and a used condom. He stated that there was 'a lot of blood' on the sheet and that there was blood on the carpet—which he stated does not show on the photo. He described it as 'very bloody.' When he left the apartment, he told [Jane] that she 'probably [did not] want to go in there [her apartment].'" Jane asked Andrew to deflate the air mattress and throw away the sheets, so he "put the sheets down the 'garbage chute.'"

Jane told Dr. Allee, "After speaking to the counselor at the Rape Treatment Center I knew there wasn't enough evidence for a criminal case and I just couldn't look at the blood. Andrew threw the bloody sheets and air mattress down the trash chute. I'm pretty sure there is still a blood stain on the carpet. I'd look the other way while he threw the bloody sheets and mattress away. . . . Maybe it was a bad idea to throw away the bloody sheets, but I knew I didn't want to go through an 18 month investigation or have my name out there."

At 7:48 p.m. John texted Jane stating, "I am so sorry about last night. I made a drunken mistake and feel horrible about it. I had no right to do what I did and I'm so so sorry. I hope you can forgive me."

E.    *The Investigation*

On April 30, 2014 Jane submitted a complaint to the USC Office of Student Judicial Affairs and Community Standards (SJACS) stating John had sexually assaulted her in the early morning of April 13, 2014.[11] Dr. Allee interviewed Jane by Skype

---

[11]    USC's 2013/2014 SCampus Student Guidebook (Guidebook) provides that a student who alleges sexual misconduct can file a formal report with SJACS. (Guidebook, § 17.01.A.) The Guidebook provides further that as part of the investigation into

about the incident. Jen was present as a support person and advisor for Jane during the interview; she was not affiliated with the USC community.

On May 1, 2014 Dr. Allee sent Jane an e-mail stating in part, "I have already received [J.D.'s] written statement to add to the evidence gathered thus far (your screenshots, contact list, UCLA records,[12] etc.). [¶] . . . [¶] I do have one request for you. Yesterday you mentioned that there is someone in [Los Angeles] who can get into your apartment. Jody [Shipper][13] and I would like to get into there early tomorrow morning, or as soon as possible to take photographs. Is this something that can be arranged?" In response, Jane wrote, "My mom is sending photos that my godsister took when she was getting some of my

---

a complaint, "the investigator will ask for all information relevant to the allegations. For both parties, this is their opportunity to present any information regarding the incident, including names of witnesses, the existence of documents or videotapes, or any other information the parties feel may be relevant. Both parties may also present supplemental information during the course of the investigation, until the investigator makes findings." (Guidebook, § 17.02.C.) Following the investigation, the investigator makes findings of fact as to whether by a preponderance of the evidence there has been a violation of the student conduct code, and can impose sanctions after consultation with the SJACS director. (Guidebook, §§ 17.02.D, 17.06.A.) Sanctions can include "expulsion, suspension, revocation of degree and revocation of admission." (Guidebook, § 17.06.B.)

[12]     The rape treatment center sent Dr. Allee a letter confirming Jane was seen at the center on April 13, 2014 for an emergency medical-forensic examination following her report of a sexual assault.

[13]     Shipper was the Title IX coordinator at USC.

14

belongings to send back.  Since I was in and out of my apartment and cleaned up some things (threw away all the sheets) there would not be much to see, but the pictures should be sufficient. [¶]  The blood soaked through a little on the mattress pad and there's stains on the living room floor.  [¶]  If it's absolutely mandatory after you view the photos, I can discuss getting a key."

On May 3, 2014 DPS served John with three letters dated May 2, 2014.  The first letter notified John that USC had received a complaint alleging he violated seven provisions of the student conduct code:  section 11.32.B (endangering others); section 11.40 (unauthorized alcohol use); section 11.44.B (lewd or obscene behavior); section 11.51.A (harassing or threatening behavior); section 11.53.A (sexual misconduct); section 11.53.B (sexual assault); and section 11.53.C (rape).[14]  The letter identified the date of the incident (4/13/2014), stated the location (off campus), and provided definitions for the alleged violations.

The second letter requested John and Jane refrain from any contact with each other.  In the third letter, USC placed John on interim suspension because Jane's complaint indicated John's

_____

[14]     The Guidebook section 11.40 defines "unauthorized alcohol use" as "[u]nauthorized use, possession or dissemination of alcohol in the university community or at university-sponsored activities."  Section 11.53.A defines "sexual misconduct" as "[e]ngaging in non-consensual sexual conduct or lewd, indecent or obscene behavior, which is sexual in nature, within the university community or at university-sponsored activities."  Section 11.53.B defines "sexual assault" as "[n]on-consensual actual or attempted intercourse, sexual touching, fondling and/or groping."  Under section 11.53.C, "[a] sexual assault is classified as rape when vaginal, anal or oral penetration, with a body part or object, takes place without the meaningful consent of the person penetrated."

15

behavior "created a clear and present danger to the safety and well-being of the university community and members thereof."[15]

Dr. Allee was the initial Title IX investigator before she was replaced in May 2014 by Mirkovich, an outside attorney.[16] Mirkovich interviewed Emily on May 21, Andrew on May 23, and Sarah on June 4, 2014. The case was transferred back to Dr. Allee on June 5, 2014. Dr. Allee did not reinterview Emily, Andrew, or Sarah. Dr. Allee conducted telephone interviews of J.D., Vance, and Carter[17] on May 6, August 14, and August 19, 2014, respectively.

On May 30, 2014 John's attorney sent an e-mail to Mirkovich and Shipper requesting "all documents and relevant

---

[15] USC suspended John because Jane told Dr. Allee "she may have been 'roofied'" and John had been "hanging around" her while she was drinking. Dr. Allee later determined there was insufficient evidence to conclude John drugged Jane.

[16] According to Shipper, Mirkovich was hired as a Title IX investigator to handle overflow cases from her office.

[17] Dr. Allee invited the parties to provide comments on Carter's statement by noon of the next day. In response, Jane e-mailed Dr. Allee later that evening, expressing her concern that Carter was offering opinions on John's "conduct without witnessing it" and recounting John's "stories." Jane also stated, "Regarding the 'gap in story' about the blood; since forensic evidence was not requested for the investigation, it was not provided, but if we were not thorough enough please let me know, as I would be more than willing to provide further clarification. I did the best I could to express over the phone and by providing evidence to the clinic hours following the incident, just how much emergency medical attention was required." John's counsel also provided a written response to Carter's interview on August 20, 2014, contending both John and Jane were inebriated but voluntarily consented to the sexual contact.

information gathered to date as part of the investigation, including but not limited to the statements the complainant made to DPS personnel, to Los Angeles Police personnel, to Student Counseling, to personnel at the Rape Treatment Center, and any other witness statements. I would also like to arrange for independent laboratory testing of the condom and complainant's clothing that the complainant preserved from the alleged incident."

On June 3, 2014 and continuing through the course of the investigation, Shipper provided John with summaries of the witness interviews, the DPS and LAPD reports, text messages, call logs, and other information the investigators gathered.[18]

Shipper contacted the rape treatment center and LAPD to inquire about the condom and Jane's clothing, but they would not confirm what they collected or release any evidence being held as property of law enforcement. John's attorney informed Shipper he learned the rape treatment center retained the condom from the sexual encounter, but not Jane's clothing. He asked USC to follow up with Jane to obtain the clothing.

On June 11, 2014 Dr. Allee notified Jane by telephone that John had requested "her clothing, if she still has it, and the condom (from SM/UCLA Rape Treatment Center) in order to do independent testing." Dr. Allee told Jane that John also requested the last name of Jane's support person. Dr. Allee wrote in her notes from the call, "[Dr. Allee] believes that [John] would like to do this testing on his own in order to better respond

---

[18] In response to a request from John's attorneys for interview notes and audio of video recordings of interviews, Shipper stated, "Neither party gets the notes from interviews, but is instead provided with the transcribed interview notes. The university does not use audio recordings for interviews."

17

to the allegations. Therefore the request is coming from John Doe rather than from [Dr. Allee] or USC."

John never received Jane's medical report or other evidence from the rape treatment center, or Jane's clothing from the night of the incident. John also requested, but did not receive Jen's last name.

On June 18, 2014 Dr. Allee met with John and his attorney. John provided two photographs of his shorts and shoes from the night of incident; they were stained with paint. He declined to provide a statement in light of the pending LAPD investigation. Dr. Allee inquired if John had any other witness names or information, and he responded he did not. Finally, Dr. Allee informed John she had a letter from the rape treatment center confirming the date Jane sought services from the center.

On August 14, 2014 Dr. Allee provided Jane and John with security camera footage of them in the elevator on the way to Jane's apartment. Dr. Allee asked Jane to confirm the footage showed Jane and John, and later Sarah and Emily.[19] Dr. Allee also wrote to Jane, "Is there a good time to speak with you tomorrow? I just have a quick question that would be better discussed on the phone."

F.    *Summary Administrative Review*

On August 20, 2014 Dr. Allee concluded her investigation and issued her summary administrative review. Dr. Allee observed, "Although the complainant did not recall many of the events from approximately 2 am until 3:30 or 4 am, she stated

---

[19]    Although the record does not indicate whether Jane provided any additional information, Dr. Allee's report reflects that the elevator footage shows Jane, John, Sarah, and Emily.

that she had spoken to [Emily, Sarah, and Andrew] to help reconstruct that time." Dr. Allee noted Jane reported "there was a long-haired person always near me with a USC shirt," and Dr. Allee inferred that person was John because the elevator camera footage showed he "had long hair and was wearing a cardinal-colored USC t-shirt and khaki shorts." As part of the investigation, Dr. Allee considered the witness statements, the two photographs of John's clothing, records of Jane's phone calls and text messages, Jane's photographs of her apartment, elevator security camera footage,[20] the DPS and LAPD reports, and the verification of services letter from the rape treatment center. Dr. Allee summarized the witness statements and found John violated the student conduct code.

Dr. Allee concluded, "After a thorough, neutral and impartial investigation, I find Mr. Doe responsible for violating the student code of conduct. This decision was reached after a thorough review of all of the relevant evidence, as noted above. I find it more likely than not that Mr. Doe knew or should have known, regardless of his own intoxication, that the complainant was too drunk to consent to sexual activity. Based on witness statements, Mr. Doe was around the complainant at the party and left the party with the complainant and her friends. I find it more likely than not that he would have seen her having difficulty walking and possibly falling down, especially given [Carter's] statement that she was hanging on [Mr. Doe] after they left the party. Careful observation of the elevator footage also reveals that the complainant pressed the wrong button in the

---

[20] In response to our request, on October 4, 2018 USC lodged the color photographs submitted by Jane and the security camera footage from the elevator, which were part of the administrative record.

elevator (on the wrong column of buttons, not simply the one above or below), and that she seemed confused (looking around on each floor as doors opened for other residents and appears to start to exit three times before finding her floor). The complainant also vomited rice in the kitchen before the alleged assault occurred, and the vomit was visible when [Andrew] walked into the apartment the next day (and therefore [Mr. Doe] would more than likely have known she vomited). Although the video footage shows the complainant walking on her own and interacting with other people in the elevator, I find it more likely than not that [Mr. Doe] would have seen her having difficulty walking, pressing the wrong elevator buttons, and vomit, clear indicators that she was too intoxicated to consent.[21] Therefore, even if she did appear to consent to vaginal sex, she was too incapacitated to understand who, what, where, when, and why

---

[21] The Guidebook states, "Consent is defined as *positive cooperation*. Consent is informed, knowing and voluntary. Consent is active, not passive. Silence, in and of itself, cannot be interpreted as consent. When people consent to sexual activity, they will have indicated, verbally or otherwise, that they are participating willingly, freely and voluntarily. Consent is an ongoing process in any sexual interaction. Consent may be withdrawn at any time during a sexual interaction. The existence of a dating relationship between the persons involved, or the fact of past sexual relations between them, should never by itself be assumed to be an indicator of consent. [¶] If you have sexual activity with someone you know to be—or should know to be—mentally or physically incapacitated (by alcohol or other drug use, unconsciousness or passed out), you are in violation of this policy. Incapacitation is a state where one cannot make a rational, reasonable decision because he or she lacks the ability to understand the who, what, when, where, why or how of the sexual interaction."

and thus could not properly consent (the university defines sexual assault as any physical sexual act perpetrated upon a person . . . where the ability to give or withhold consent is impaired due to the influence of alcohol or other drugs). Furthermore, she did not consent to anal sex. Moreover, the evidence provided demonstrates that the complainant acted in ways consistent with the belief that she had been sexually assaulted, and that this behavior occurred immediately after the incident. Mr. Doe also apologized twice, once verbally and again in a text message, noting that he 'had no right to do what (he) did.'" (Fn. omitted.)

Dr. Allee addressed the two photographs of John's khaki shorts and red shoes that showed "extensive paint stains in the colors of red, yellow, and blue (in the order of prominence)." Dr. Allee stated, "Mr. Doe has made no statements on his own behalf, but presumably the photographs were offered to demonstrate that there was paint on the sheets and mattress, and that the pools of red and streaks of red seen on the carpet and mattress the next day were not blood. Although it is possible that some of the red substance on the sheets, air mattress, and carpet was paint, the complainant and [Andrew] specifically described blood. However there was no yellow or blue, only red, and red was also seen as being a larger pool, which is inconsistent with leftover dried paint transferred from clothing and skin several hours later. Furthermore, the complainant reported 'I realized I was covered in blood in my rectum area and on my thighs. I put on a maxi dress to cover the blood and paint.' This statement indicates she made a distinction between the blood and the paint. [Andrew] said there were puddles of blood on the air mattress, 'a lot of blood' on the sheet, and that there was blood on the carpet—which he stated does not show on the

21

photo. He described it as 'very bloody.' He also did not describe yellow or blue, or the other paint colors that would also have transferred."

Dr. Allee found Sarah's conflicting statement—that there was no blood in Jane's apartment in the morning after the sexual encounter—was not "sufficiently reliable." Dr. Allee explained, "[Sarah's] statement contains several inconsistencies regarding the appearance of the complainant's apartment. She stated that on the one hand the complainant's apartment is always 'pretty messy,' and that she 'wouldn't have noticed a difference if it was messier' than earlier that day. She also stated that the next morning the apartment 'seemed cleaner.' Further, it is unclear how long she was at the complainant's apartment the next morning. She reported she grabbed her stuff and left, and then that she was there for five to ten minutes. Therefore, her observations on the appearance of the apartment are not considered sufficiently reliable."

Dr. Allee imposed the sanction of expulsion and prohibited John from having any contact with Jane. Dr. Allee advised the parties, "A permanent notation of expulsion will appear on the student's academic transcript . . . ."

G.    *John's Appeal to the Student Behavior Appeals Panel*

On September 4, 2014 John appealed Dr. Allee's decision to the Student Behavior Appeals Panel (Appeals Panel).[22] John

---

[22]    USC provides for an appeal from the investigator's decision to a three-member Appeals Panel. (Guidebook, §§ 17.07.A, 17.07.F.) The Appeals Panel does not provide for an in-person hearing; instead, "all appeals are documentary reviews in which no oral testimony is taken and no oral argument takes place." (Guidebook, § 17.07.C.) USC limits an appeal to three grounds:

contended he was not provided a fair hearing, the findings did not support the decision, exculpatory evidence was destroyed or not made available, Dr. Allee failed to follow USC rules and regulations in her investigation, and the sanction imposed was excessive. Jane responded to John's appeal, stating there was no new evidence, John had provided "a rather distorted view of the facts that do exist," and John "does not explain how the damage done to my body demonstrates consent; he simply fails to discuss it at all."

The Appeals Panel denied John's appeal, noting John had failed to address the three grounds set forth in the USC guidelines. The Appeals Panel concluded there was "significant eyewitness testimony that Ms. Roe was severely intoxicated" and unable to consent. Further, even if she consented to sexual activity, the "evidence does not support Mr. Doe's contention that he stopped all physical activity once he realized that he did not have consent to perform anal intercourse. Rather, the evidence indicates that Mr. Doe continued performing anal intercourse with Ms. Roe despite that it was causing her physical injury, including a significant amount of bleeding." The Appeals Panel recommended immediate expulsion and avoidance of all contact with Jane. On November 12, 2014 vice provost Ainsley Carry

---

"1. That new evidence has become available which is sufficient to alter the decision and which the appellant was not aware of or which could not have been reasonably obtained at the time of the original review. [¶] 2. That the sanction imposed is excessive, insufficient or inappropriate. [¶] 3. That the investigator failed to follow university rules while reviewing the cited behavior." (Guidebook, § 17.07.D.) The Appeals Panel drafts a recommended decision, which the vice provost of student affairs may modify before it becomes final. (Guidebook, § 17.07.F.)

informed John that Carry had approved the Appeals Panel decision, which became final.

H.    *The Trial Court Writ Proceeding*

On January 22, 2015 John filed an amended petition for a writ of administrative mandamus under Code of Civil Procedure[23] section 1094.5, raising procedural and substantive challenges.[24]  In his opening brief John argued he was denied fair process and USC's findings were not supported by substantial evidence.  John contended the investigation was unfair because "USC failed to provide exculpatory evidence of Ms. Roe's [rape treatment center] report, clothing from the date of the alleged incident, and the condom(s) that were found in her apartment." John also argued he was not provided an "impartial hearing panel or truly independent adjudicator."  In addition, "Dr. Allee failed to conduct independent interviews" of Emily, Sarah, and Andrew; instead, she relied on Mirkovich's interview summaries. John contended "USC deprived [him] of his right to cross-examine witnesses, and instead relied on Dr. Allee to conduct her self-proclaimed thorough and impartial investigation.  Dr. Allee failed to examine witnesses on weaknesses in their stories and fill in gaps in other witnesses' stories."  John also argued USC failed to provide Jen's last name or identify the members of the

---

[23]    Further undesignated statutory references are to the Code of Civil Procedure.

[24]    As we noted in *Doe v. University of Southern California* (2018) 28 Cal.App.5th 26, "The remedy of administrative mandamus is available to review adjudicatory decisions of private organizations, including universities." (*Id.* at p. 31, fn. 9; accord, *Doe v. University of Southern California* (2016) 246 Cal.App.4th 221, 237 & fn. 9.)

24

Appeals Panel.  Finally, John challenged the selective enforcement of the unauthorized alcohol use provision of the student conduct code because Jane was not disciplined for violating it.

In its opposition USC argued John had been provided a fair hearing and Dr. Allee's findings were supported by substantial evidence.  As to the evidence, USC asserted it had requested, but was not able to obtain, the condom, Jane's clothes from the night of the incident, and Jane's private medical records from the rape treatment center.

After taking the case under submission, on February 8, 2016 the trial court issued a 40-page ruling denying John's petition.  The trial court found there was substantial evidence to support USC's decision.  The trial court deferred to USC's finding that Jane's testimony was credible that she lacked the capacity to consent and did not consent to the sexual activity, and noted her testimony was corroborated by Andrew and J.D.

As to John's fair hearing claim, the trial court found John did not adequately present his contentions because his "bullet-points contain[ed] no citations" to case law or the administrative record.  Nonetheless, the court found the USC procedures provided John notice of the charges, "a 'fair, thorough, neutral and impartial investigation,'" the right to inspect documents and information, the right to present witnesses and information, the right to a written decision by the investigator, and the right to appeal the decision, and therefore satisfied "the due process requirements for post-secondary expulsion hearings set forth in *Goldberg* [*v. Regents of University of California* (1967) 248 Cal.App.2d 867]."

The trial court rejected John's contention that due process entitled him to cross-examination of witnesses and to learn the

identities of Jane's advisor and the Appeals Panel members. In addition, while John had "[t]he right to a neutral adjudicator," he failed to demonstrate he was denied that right. The trial court concluded that in the absence of evidence rebutting the presumption that a hearing officer is "an impartial arbiter," there was "nothing per se improper with Dr. Allee's role as both an investigator and adjudicator." The court rejected John's contention he had a right to Jane's medical records from the rape treatment center, Jane's clothing, or the condom, stating that John "provides no authority for the proposition that [USC], a private institution conducting a non-criminal disciplinary proceeding, is required to provide him with 'exculpatory' evidence that is protected by both federal medical privacy laws and the official information privilege."

The trial court entered judgment denying John's writ petition on February 29, 2016. John timely appealed.

## DISCUSSION

A.    *John Did Not Forfeit His Unfair Hearing Contentions*

USC contends John forfeited the argument he was denied a fair hearing because he did not properly raise a challenge to USC's procedures in the trial court. Generally, a party cannot raise new issues or change the theory of a cause of action for the first time on appeal. (*Johnson v. Greenelsh* (2009) 47 Cal.4th 598, 603; *Franz v. Board of Medical Quality Assurance* (1982) 31 Cal.3d 124, 143 [petitioner forfeited contention he was denied a fair hearing because of a panel member's bias where he did not raise this issue before the agency or the trial court].) ""This rule is based on fairness—it would be unfair, both to the trial court and the opposing litigants, to permit a change of theory on

26

appeal . . . ."'" (*American Indian Health & Services Corp. v. Kent* (2018) 24 Cal.App.5th 772, 789; accord, *C9 Ventures v. SVC-West, L.P.* (2012) 202 Cal.App.4th 1483, 1492 ["opposing party should not be required to defend for the first time on appeal against a new theory"].)  Nevertheless, an appellate court has discretion to consider an issue for the first time on appeal "'where the relevant facts are undisputed and could not have been altered by the presentation of additional evidence.'" (*American Indian Health & Services Corp. v. Kent*, at p. 789; accord, *C9 Ventures v. SVC-West, L.P.*, at p. 1492.)

Here, although John's arguments did not cite to case law or the administrative record, the trial court proceeded to address John's contentions, including whether he had a right to cross-examination and exculpatory evidence.  Further, USC responded to John's arguments.  Moreover, the facts are not in dispute. Under these circumstances, John did not forfeit his fair hearing contentions on appeal.  (See *American Indian Health & Services Corp. v. Kent*, *supra*, 24 Cal.App.5th at p. 789.)

B.    *Standard of Review*

"The question presented by a petition for writ of administrative mandate is whether the agency or tribunal that issued the decision being challenged 'proceeded without, or in excess of, jurisdiction; whether there was a fair trial; and whether there was any prejudicial abuse of discretion.'  (§ 1094.5, subd. (b).)" (*Doe v. University of Southern California, supra*, 28 Cal.App.5th at p. 34; accord, *Doe v. Regents of University of California* (2018) 28 Cal.App.5th 44, 55 (*UC Santa Barbara*); *Doe v. Regents of University of California* (2016) 5 Cal.App.5th 1055, 1072 (*UC San Diego*).)  "Abuse of discretion is established if the respondent has not proceeded in the manner required by law, the

order or decision is not supported by the findings, or the findings are not supported by the evidence." (§ 1094.5, subd. (b).)

A university disciplinary proceeding concerning sexual misconduct does not involve a fundamental vested right; thus, we review the administrative decision applying the same standard of review applicable in the trial court. (*Doe v. Claremont McKenna College* (2018) 25 Cal.App.5th 1055, 1065 (*Claremont McKenna*); *Doe v. University of Southern California* (2016) 246 Cal.App.4th 221, 239 (*University of Southern California*).) We review USC's findings for substantial evidence in light of the whole record. (§ 1094.5, subd. (c) ["abuse of discretion is established if the court determines that the findings are not supported by substantial evidence in the light of the whole record"]; *UC Santa Barbara, supra*, 28 Cal.App.5th at p. 56; *UC San Diego, supra*, 5 Cal.App.5th at p. 1073.) However, we review the fairness of the administrative proceeding de novo. (*UC Santa Barbara*, at p. 56; *Claremont McKenna*, at p. 1065; *UC San Diego*, at p. 1073.)

C. *John Was Denied a Fair Hearing*

1. *General principles of fairness*

In evaluating the fairness of a student disciplinary proceeding, courts have recognized the competing interests of the university, the complaining student, and the accused student. (See *Claremont McKenna, supra*, 25 Cal.App.5th at p. 1066; *UC San Diego, supra*, 5 Cal.App.5th at pp. 1077-1078.) "With respect to student discipline, '[t]he student's interest is to avoid unfair or mistaken exclusion from the educational process, with all its unfortunate consequences. . . . Disciplinarians, although proceeding in utmost good faith, frequently act on the reports and advice of others; and the controlling facts and the nature of the conduct under challenge are often disputed. The risk of error is

not at all trivial, and it should be guarded against if that may be done without prohibitive cost or interference with the educational process.'" (*University of Southern California, supra,* 246 Cal.App.4th at p. 240, quoting *Goss v. Lopez* (1975) 419 U.S. 565, 579-580 (*Goss*); accord, *Claremont McKenna*, at p. 1066; *UC San Diego*, at p. 1077.)  But courts also acknowledge that ""'[a] formalized hearing process would divert both resources and attention from a university's main calling, that is education.'"" (*Claremont McKenna*, at p. 1066, quoting *UC San Diego*, at p. 1078.)  Moreover, "[d]isciplinary proceedings involving sexual misconduct must also account for the well-being of the alleged victim, who often 'live[s], work[s], and stud[ies] on a shared college campus' with the alleged perpetrator." (*Claremont McKenna*, at p. 1066, quoting *University of Southern California,* at p. 245.)

"In disciplining college students, the fundamental principles of fairness require, at a minimum, 'giving the accused students notice of the charges and an opportunity to be heard in their own defense.'" (*UC Santa Barbara, supra,* 28 Cal.App.5th at p. 56; see *Goss, supra,* 419 U.S. 565 at pp. 579, 581 [public high school students facing suspension "must be given *some* kind of notice and afforded *some* kind of hearing" under due process clause].)  "[A] student disciplinary proceeding at a university does not provide the same due process protections afforded to a defendant in a criminal trial." (*UC San Diego, supra*, 5 Cal.App.5th at p. 1078; accord, *Goldberg v. Regents of University of California, supra*, 248 Cal.App.2d at p. 881 (*Goldberg*) ["procedures for dismissing college students were not analogous to criminal proceedings"].)  "However, 'to comport with due process,' the university's procedures must "'be tailored, in light of the decision to be made, to 'the capacities and

29

circumstances of those who are to be heard,' [citation] . . . to insure that they are given a meaningful opportunity to present their case."'" (*UC San Diego*, at p. 1078.)[25]

>    2.    *Where a university's determination turns on witness credibility, the adjudicator must have an opportunity to assess personally the credibility of critical witnesses*

John contends he was denied a fair hearing because Dr. Allee did not reinterview critical witnesses who had been interviewed by Mirkovich, including Sarah, Emily, and Andrew, to enable Dr. Allee to assess their credibility.[26] We agree.

---

[25]    Many of the opinions addressing student disciplinary proceedings, including *UC San Diego*, *UC Santa Barbara* and *Goldberg*, concerned public universities subject to federal constitutional guarantees not applicable to private colleges. As the court in *Claremont McKenna* recognized, "Due process jurisprudence nevertheless may be 'instructive' in cases determining fair hearing standards for student disciplinary proceedings at private schools." (*Claremont McKenna, supra*, 25 Cal.App.5th at p. 1067, fn. 8; accord, *University of Southern California, supra*, 246 Cal.App.4th at p. 245.) However, it is not the case that "the fair hearing requirements under section 1094.5 are in all ways equivalent to those under the federal and California Constitutions . . . ." (*Claremont McKenna*, at p. 1067, fn. 8.) As in *Claremont McKenna*, we need not address the differences between the requirements for disciplinary proceedings at public and private universities because we conclude the process here did not provide John a fair hearing under section 1094.5.

[26]    John also contends Dr. Allee "possibly" failed to interview J.D. Although Dr. Allee principally relied on J.D.'s written statement, she also interviewed him by telephone. A telephone interview would not provide an opportunity for Dr. Allee to assess J.D.'s demeanor during the interview, raising some of the same

30

As our colleagues in Division One concluded in *Claremont McKenna*, "where the accused student faces a severe penalty and the school's determination turns on the complaining witness's credibility . . . the complaining witness must be before the finder of fact either physically or through videoconference or like technology to enable the finder of fact to assess the complaining witness's credibility in responding to its own questions or those proposed by the accused student." (*Claremont McKenna, supra*, 25 Cal.App.5th at p. 1070; accord, *Doe v. Baum* (6th Cir. 2018) 903 F.3d 575, 581-582 (*Baum*) ["if a university is faced with competing narratives about potential misconduct," some form of in-person questioning is required to enable "the fact-finder [to] observe the witness's demeanor under that questioning"]; *Doe v. University of Cincinnati* (6th Cir. 2017) 872 F.3d 393, 401 (*Cincinnati*) ["[T]he opportunity to question a witness and observe her demeanor while being questioned can be just as important to the trier of fact as it is to the accused."].)[27]

---

concerns for evaluating credibility. Because we conclude the failure to interview Sarah, Emily, and Andrew denied John a fair hearing, we do not reach whether Dr. Allee should have interviewed J.D. or other witnesses, including Vance and Carter, in person or by videoconference.

[27] On April 4, 2011 the United States Department of Education Office for Civil Rights (OCR) issued a "Dear Colleague" letter, in which it provided guidance on how universities should investigate and resolve complaints of student sexual misconduct. (*UC San Diego, supra*, 5 Cal.App.5th at p. 1085; *University of Southern California, supra*, 246 Cal.App.4th at p. 245.) On September 22, 2017 OCR withdrew its 2011 Dear Colleague letter and initiated a rulemaking process with public comment. (OCR, Dear Colleague Letter (Sept. 22, 2017) <https://www2.ed.gov/about/offices/list/ocr/letters/colleague-title-ix-

As the Supreme Court explained in *Elkins v. Superior Court* (2007) 41 Cal.4th 1337, in invalidating a local court rule and trial scheduling order requiring parties in contested marital dissolution trials to rely on written declarations instead of live testimony, "Oral testimony of witnesses given in the presence of the trier of fact is valued for its probative worth on the issue of credibility, because such testimony affords the trier of fact an opportunity to observe the demeanor of witnesses." (*Id.* at p. 1358.)

In *Claremont McKenna* and *Cincinnati*, the courts addressed whether a student accused of sexual misconduct had a right to question the complainant, either directly or indirectly, to enable the trier of fact to assess her credibility. Both courts concluded the accused student had this right where credibility was central to the university's determination. (*Claremont McKenna, supra*, 25 Cal.App.5th at p. 1070; *Cincinnati, supra,* 872 F.3d at p. 401.)

In *Baum*, the Sixth Circuit extended this analysis to questioning of witnesses other than the complainant where the

201709.pdf> [as of Dec. 7, 2018].) On November 15, 2018 OCR proposed regulations modifying the minimum standards for a Title IX investigation into alleged sexual misconduct. (OCR, Title IX of the Education Amendments of 1972 Notice of Proposed Rulemaking <https://www2.ed.gov/about/offices/list/ocr/docs/title-ix-nprm.pdf> [as of Dec. 7, 2018] (Proposed Regulations).) Under the Proposed Regulations, an investigator could not serve as the adjudicator, universities would be required to hold a live hearing, and the complainant and accused student would have an opportunity for the student's "advisor" to cross-examine the complainant and all witnesses in person or through a technological substitute. (Proposed Regulations, § 106.45, subd. (b)(3), (4).)

32

fact-finder found the complainant and witnesses who corroborated the complainant's version of events more credible than the accused student and witnesses who corroborated his side of the story. (*Baum, supra*, 903 F.3d at pp. 582-583.)

The same considerations underlying the holdings in *Claremont McKenna, Baum*, and *Cincinnati* apply here. Where a student faces a potentially severe sanction from a student disciplinary decision and the university's determination depends on witness credibility, the adjudicator must have the ability to observe the demeanor of those witnesses in deciding which witnesses are more credible. (*Claremont McKenna, supra*, 25 Cal.App.5th at p. 1070; *Baum, supra*, 903 F.3d at p. 581; *Cincinnati, supra*, 872 F.3d at p. 402.) This will typically be the case in disciplinary proceedings involving sexual misconduct where there is no corroborating physical evidence to assist the adjudicator in resolving conflicting accounts.[28]

In *Claremont McKenna*, the parties were the only witnesses to the incident, and without the complaining witness's statement,

---

[28] We recognize the added burden on the university and the witnesses that would result from requiring an in-person or videoconference interview. However, given the available videoconference technologies like Skype, the additional burden is not significant and must be weighed against the importance of the determination, especially where the accused student faces a severe sanction. We do not suggest that all witnesses must be interviewed in this manner. However, where the witness accounts are in conflict and the adjudicator must determine which account to believe, or the adjudicator otherwise questions the veracity of a witness's account, it is essential for the adjudicator to have an opportunity to observe the demeanor of those witnesses where the determination turns on their credibility.

there was no corroborating evidence she did not consent to have sex with the accused student. (*Claremont McKenna*, *supra*, 25 Cal.App.5th at p. 1070.) On these facts, Division One reversed the trial court's denial of the accused student's petition for a writ of administrative mandate, concluding fairness required all three members of the adjudicatory committee hear the complaining witness's account of the incident before they decided to believe her account over that of the accused student. (*Id.* at pp. 1072-1073.)

In *Cincinnati*, the Sixth Circuit similarly held the accused student showed a likelihood of success on the merits that he was denied a fair hearing where the review panel relied on the investigator's written report of the complaining witness's statement to find her account, that she had not consented to sex, more believable than that of the accused student, who asserted the encounter was consensual. (*Cincinnati*, *supra*, 872 F.3d at pp. 402, 407.) The court observed, "Given the parties' competing claims, and the lack of corroborative evidence to support or refute [the complainant's] allegations, the present case left the [review] panel with 'a choice between believing an accuser and an accused.' [Citation.] Yet, the panel resolved this 'problem of credibility' without assessing [the complainant's] credibility. [Citation.] In fact, it decided [the accused student's] fate without seeing or hearing from [the complainant] at all. That is disturbing and, in this case, a denial of due process." (*Id.* at p. 402.) In *Baum*, the complainant and accused student provided different accounts as to whether the complainant was too intoxicated the evening of the incident to have the capacity to consent to sex. (*Baum, supra*, 903 F.3d at pp. 578-579.) The investigator interviewed 23 witnesses: the female witnesses corroborated the complainant's story; the male witnesses

34

corroborated the accused student's story.  (*Id.* at p. 579.)  The Sixth Circuit concluded the trial court erred in dismissing the accused student's due process claim, finding there was a "significant risk" the university denied him due process by relying on witness statements instead of live testimony where the university's determination turned on the credibility of the complainant, the accused student, and the witnesses.  (*Id.* at pp. 581-582, 585.)

Under USC's sexual misconduct review procedures, John was not entitled to a hearing.  Instead, the Title IX investigator served as both the investigator and adjudicator.[29]  Although Jane reported she blacked out after the paint party and spoke with Emily, Sarah, and Andrew to reconstruct what happened between 2:00 a.m. and 4:00 a.m. when the incident occurred, Dr. Allee did not interview these critical witnesses, and instead relied on Mirkovich's summaries.

---

[29] Although the Title IX investigator held dual roles as the investigator and adjudicator, "the combination of investigative and adjudicative functions does not, without more, constitute a due process violation . . . ."  (*Withrow v. Larkin* (1974) 421 U.S. 35, 58; accord, *Griggs v. Board of Trustees* (1964) 61 Cal.2d 93, 98 ["the combination of adjudicating functions with prosecuting or investigating functions will ordinarily not constitute a denial of due process"]; *Southern Cal. Underground Contractors, Inc. v. City of San Diego* (2003) 108 Cal.App.4th 533, 548-549 [rejecting contention that hearing was not before impartial tribunal because city was both prosecutor and adjudicator]; *Hongsathavij v. Queen of Angels etc. Medical Center* (1998) 62 Cal.App.4th 1123, 1142 ["[o]verlapping investigatory, prosecutorial and adjudicatory functions do not necessarily deny a fair hearing and are common before most administrative boards"].)

Andrew and Sarah gave conflicting accounts as to the condition of the apartment and whether there was blood in the apartment on the morning of the incident. Andrew described Jane's apartment as "disheveled," with "puddles of blood on the air mattress, which were about 6 inches in size," as well as "a lot of blood" on the sheets and blood on the carpet. Yet Sarah stated when she returned to Jane's apartment on the morning of April 13, it "seemed cleaner" and looked "really empty." She was in the apartment for five or 10 minutes, and did not recall seeing blood or paint on the floor or mattress. Dr. Allee found Sarah's statement about the apartment and the absence of blood were not "sufficiently reliable," although she never interviewed Sarah to inquire about any inconsistencies in her statement or to assess her demeanor.[30]

Further, it is undisputed red paint was used at the party. Sarah told Mirkovich she had red paint behind her ears and on her body for days after the party and the red paint looked like "bruises and blood." Jane similarly texted J.D. to say she looked like a "battered convict" because "the paint looks like bruises." Jane recalled she put on a maxi dress before going to the rape treatment center "to cover the blood and paint." Thus, determination of whether there was blood or red paint (or neither) in the apartment after the incident was important to the university's determination. Indeed, in Dr. Allee's report she noted "it is possible that some of the red substance on the sheets, air mattress, and carpet was paint," but pointed out that Jane and Andrew "specifically described blood."

---

[30] Evaluation of Andrew's credibility would also have been important in light of the fact he was dating Jane at the time of the incident and disposed of the asserted bloody sheets.

Emily's statements were also central because Jane reported to Dr. Allee that she blacked out, and "[m]ost of the memories come from Emily."

In addition, as in *Claremont McKenna*, *Cincinnati*, and *Baum*, there was no physical evidence showing there was blood on Jane's body or in the apartment after the incident. It is undisputed that Andrew, at Jane's direction, threw out the sheets and deflated the air mattress. Andrew acknowledged the color photographs provided by Jane did not show any blood in the apartment. This was contrary to Jane's statement that the blood soaked through the mattress pad, and there were stains on the living room floor that were reflected in the photographs. Jane's clothing from the evening and the SART rape treatment kit might have revealed whether there was blood or red paint on Jane, but neither was obtained by Dr. Allee as part of her investigation. Thus, Dr. Allee was left to rely on the conflicting statements of witnesses as to whether the alleged nonconsensual anal sex caused Jane to bleed.[31]

There is no question that expulsion from the university was a severe sanction. Given the conflicting witness statements and lack of corroborating evidence, a fair hearing required Dr. Allee

---

[31] Although Dr. Allee could have based her finding of a lack of consent solely on Jane's level of intoxication, both she and the Appeals Panel pointed to the evidence of blood on Jane's body and in the apartment in reaching the conclusion Jane did not consent to anal sex. In addition, the evidence of a forced sexual encounter, resulting in bleeding, could have impacted the imposition of the severe sanction of expulsion. The Appeals Panel stated, "[T]he evidence indicates that [John] continued performing anal intercourse with [Jane] despite that it was causing her physical injury, including a significant amount of bleeding."

as the adjudicator to assess personally the credibility of critical witnesses, including Sarah, Emily, and Andrew, in person or by videoconference or other technological means, which would have provided Dr. Allee an opportunity to observe the witnesses' demeanor during the interview.[32]

3. *If USC conducts a new disciplinary proceeding, it should allow John to submit questions for the adjudicator to ask Jane*

We have concluded John was deprived of a fair hearing because Dr. Allee as the adjudicator had no opportunity to assess personally the credibility of the critical witnesses—Sarah, Emily, and Andrew. In addition, as part of the adjudicator's assessment of credibility, an accused student must have the opportunity indirectly to question the complainant.[33] (*UC Santa Barbara,*

---

[32] At many universities, a hearing is provided at which an adjudicative panel considers the testimony of the parties and other witnesses. (See, e.g., *UC Santa Barbara, supra*, 28 Cal.App.5th at pp. 49-52, 57 [two-member committee hears testimony from parties and other witnesses at hearing]; *Claremont McKenna, supra*, 25 Cal.App.5th at pp. 1062-1064 [three-member committee comprised of investigator and two faculty or staff members holds hearing at which parties may make oral statements]; *UC San Diego, supra*, 5 Cal.App.5th at pp. 1080-1081 [three-member panel holds hearing with testimony from parties and witnesses; parties may propose written questions to ask parties and witnesses].) Where the determination of sexual misconduct by the adjudicators turns on witness credibility, the hearing panel likewise would need to ensure the panel has an opportunity to assess the credibility of critical witnesses in person or by videoconference.

[33] Under USC's procedures, the accused student does not have "the right to confront accusers." (Guidebook, § 17.03.)

*supra*, 28 Cal.App.5th at p. 60 [accused student was deprived of right to cross-examine complainant and to present his defense where committee allowed her to refuse to answer questions about the side effects of an antidepressant medication she was taking at the time of the alleged sexual assault on privacy grounds]; *Claremont McKenna, supra*, 25 Cal.App.5th at p. 1057 [college should have required complainant to appear at hearing in person or by videoconference to allow "the Committee[] [to ask] her appropriate questions proposed by John or the Committee itself"]; *Cincinnati, supra*, 872 F.3d at p. 406 [accused student had a right to question the complainant through the review committee where the committee had to decide whether to believe the complainant or accused student].)[34]

USC's procedures do not provide an accused student the right to submit a list of questions to ask the complainant, nor was John given that opportunity here.[35] If USC proceeds with a new

---

Thus, consistent with California law, John did not have a right directly to question Jane or the other witnesses. (See *UC San Diego, supra*, 5 Cal.App.5th at p. 1084 ["There is no requirement under California law that, in an administrative hearing, an accused is entitled to cross-examine witnesses."]; *University of Southern California, supra*, 246 Cal.App.4th at p. 245 ["'[A]lthough we recognize the value of cross-examination as a means of uncovering the truth [citation], we reject the notion that as a matter of law every administrative appeal . . . must afford the [accused] an opportunity to confront and cross-examine witnesses.'"].)

[34] On appeal, John does not address the right to submit a list of questions, but in the trial court he contended he was deprived of the right to cross-examine Jane and the other witnesses.

[35] Under USC's procedures, the complainant and accused students have certain procedural rights, including: "A. Written

39

disciplinary proceeding, it should afford John an opportunity to submit a list of questions to ask Jane.[36]

### 4. *The investigator did not conduct a fair and thorough investigation, as required by USC's procedures*

"Where student discipline is at issue, the university must comply with its own policies and procedures." (*University of Southern California, supra*, 246 Cal.App.4th at p. 239; accord, *UC San Diego, supra*, 5 Cal.App.5th at p. 1073.) John contends USC violated its own procedures by failing to conduct "[a] fair, thorough, neutral and impartial investigation of the incident."

---

notice of the incident report that specifies the nature of the alleged violation and the basis for the charge including the date or period of time and location regarding the alleged incident"; "D. A fair, thorough, neutral and impartial investigation of the incident"; and "E. At the start of the investigation, a summary of rights, investigation procedures and avenue of appeal." (Guidebook, § 17.03.A, D, E.) In addition, "[b]oth parties have the right to inspect documents and/or relevant information gathered as part of the investigation (though medical information may be kept confidential)." (*Id*., § 17.03.F.) The list of procedural rights does not include a right to submit a list of questions for the investigator to ask the complainant or other witnesses.

[36] Although it would be a better practice to allow the complainant and accused student to submit a list of questions to ask witnesses for whom the fact-finder needs to make a credibility determination, we do not reach whether John's inability indirectly to ask questions of Sarah, Emily, and Andrew violated his right to a fair hearing. (See *Baum, supra*, 903 F.3d at p. 582 [accused student's inability to cross-examine complainant or her witnesses posed "a significant risk that the university erroneously deprived [accused student] of his protected interests"].)

(Guidebook, § 17.03.D.)  Among other arguments, John contends USC failed to obtain Jane's clothes from the night of the party or her medical records from the rape treatment center to help resolve the conflict over whether substances on Jane's body and in her apartment were red paint or blood.[37]  We agree USC violated its own procedures by failing *to request* that Jane provide her clothes or consent to release her medical records.

Jane told Dr. Allee that Andrew threw away the sheets at her request, but Jane had collected the clothes she wore the night of the party as evidence.  Yet Dr. Allee did not request Jane provide her clothes as part of the investigation.  Rather, she only informed Jane that John had requested Jane's clothes (and the condom Jane found in the apartment) because John wanted "to do [independent] testing on his own in order to better respond to the allegations."  Further, by emphasizing "the request [was] coming from John Doe rather than from [Dr. Allee] or USC," this made it easier for Jane to ignore the request, hampering John's ability to defend himself.  (See *UC Santa Barbara, supra,*

---

[37]     John contends Dr. Allee withheld Jane's medical records, pointing to a May 1, 2014 e-mail from Dr. Allee to Jane stating she had obtained "UCLA records."  However, there is no evidence in the administrative record that USC obtained Jane's medical records from the rape treatment center.  Instead, in her summary administrative review Dr. Allee only references the "verification of services letter" from the rape treatment center.  John also contends Dr. Allee "engaged in willful ignorance by apparently failing to observe the 'bloodied' carpet in [Jane's] apartment first-hand."  But when Dr. Allee asked Jane for access to the apartment to take photographs on May 1, 2014, it was already 18 days after the April 13, 2014 incident.  Dr. Allee could reasonably have concluded the photographs Jane e-mailed her were sufficient, especially given that Jane was no longer at USC or in California.

41

28 Cal.App.5th at p. 60 [by allowing complainant to decline to answer accused student's questions because it was her "'private medical information,'" the committee "impeded his ability to present relevant evidence in support of his defense"].)

In addition, John requested the medical report and other evidence from the rape treatment center, but Dr. Allee never asked Jane if she would consent to release of this information.  In Jane's e-mail to Dr. Allee in response to Carter's witness statement, Jane stated, "[S]ince forensic evidence was not requested for the investigation, it was not provided, but if we were not thorough enough please let me know, as I would be more than willing to provide further clarification."  Jane appeared willing to provide additional "forensic evidence," but Dr. Allee never followed up with Jane to obtain her consent to release her medical records.

We recognize Jane's medical records are protected by federal privacy laws, and USC would have to obtain Jane's consent before it could release the records to John.  Under the Health Insurance Portability and Accountability Act of 1996 (42 U.S.C. § 1320d et seq.) privacy rules, a healthcare provider (such as the rape treatment center) cannot disclose protected health information without the consent of the patient, unless the provider receives an order, warrant, subpoena, or summons signed by a judicial officer; a grand jury subpoena; or an administrative subpoena, summons, or investigative demand from law enforcement.  (45 C.F.R. § 164.512(e)(1)(i) & (f)(1)(ii).)  Because none of the exceptions applies here, USC would need Jane's written authorization to obtain her medical records from

the rape treatment center.  (45 C.F.R. § 164.508.)[38]  But this does not mean USC was excused from requesting that Jane provide consent to the release of her medical records, which she may well have given in this case (subject to confidentiality protections).[39]

## DISPOSITION

The judgment is reversed and the matter remanded to the trial court with directions to grant John's writ of administrative mandamus.  John is awarded his costs on appeal.

FEUER, J.

WE CONCUR:

PERLUSS, P. J.

ZELON, J.

---

[38]  In addition, even if USC were able to obtain Jane's medical records, they were subject to the Family Educational Rights and Privacy Act, which generally prohibits the disclosure of "personally identifiable information" in student education records without the student's written consent.  (20 U.S.C. § 1232g(b); 34 C.F.R. § 99.30.)

[39]  Because we conclude John was denied a fair hearing, we do not reach John's other contentions, including whether substantial evidence supported USC's decision to expel John for violations of the student conduct code and other grounds John asserts to support his claim he was denied a fair hearing.