Filed 2/10/21

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| MARCUS KNIGHT, | |
| Plaintiff and Respondent, | G058644 |
| v. | (Super. Ct. No. 30-2019-01055547) |
| SOUTH ORANGE COMMUNITY COLLEGE DISTRICT et al., | O P I N I O N |
| Defendants and Appellants. | |

Appeal from a judgment of the Superior Court of Orange County, Ronald L. Bauer, Judge.  Reversed.

Walsh & Associates and Dennis J. Walsh for Defendants and Appellants.

Hathaway Parker, Mark M. Hathaway and Jenna E. Parker for Plaintiff and Respondent.

**INTRODUCTION**

Cultural evolution works faster than physical evolution. The body politic changes more rapidly than the body, and sometimes the swiftness of that change can be difficult for established institutions. Organizations that have functioned successfully for a long time doing things one way may find it difficult to adjust to new realities. In this case we deal with the efforts of an educational institution to deal with such changes. We conclude it complied with the law.

Saddleback College and Juan Avalos, vice-president of Saddleback's student services and its Title IX officer, appeal from a judgment granting the petition of Marcus Knight, a Saddleback student, for a writ of mandamus.[1] Knight petitioned the court regarding discipline imposed on him after two female students complained that he was following them, taking photos of one of them on his phone, and touching them. Knight has multiple disabilities, including cerebral palsy and autism, which have complicated his experience at Saddleback.

In March 2018, Knight received a letter from Avalos stating that he was "suspended" – that is, barred from classes and campus activities. It appears, however, that he was allowed to attend classes anyway, while he contested the suspension. Eventually the potential suspension was dropped, and a written disciplinary reprimand was placed in his student record instead.

In the trial court, Knight based his mandamus petition on the ground that the college did not afford him due process before it suspended him. By due process, he did not mean notice and an opportunity to be heard, both of which he had. He meant a hearing during which he or his counsel could confront and cross-examine witnesses. The trial court granted the writ petition on that basis.

---

[1] Saddleback College answered the petition as South Orange County Community College District.

2

Unquestionably, a student is entitled to some form of hearing and witness confrontation before he or she can be suspended or expelled. The question before us is whether Knight was entitled to the same level of due process before a written reprimand could be placed in his student record, if he suffered no other official detriment.

We conclude that he was not entitled to this level of due process. The parties have not presented us with any authority on point, and we have found none. We have concluded that requiring a trial-like hearing before Saddleback could issue a written reprimand places too great a burden on the college when compared to the minor detriment to Knight. He received notice of the charges against him, and he had an opportunity to respond – several opportunities, in fact. Had the suspension gone forward, he would have had the hearing he feels he was entitled to. But it did not go forward, and he received a much lower level of discipline. Accordingly, we reverse the judgment for Knight and direct the trial court to enter judgment for appellants.

## FACTS

South Orange County Community College District's administrative regulation No. 5401 governs standards of student conduct. It lists the activities for which students can be disciplined, among which are violations of district regulations. Administrative regulation No. 4000.5 prohibits "harassment," including "physical harassment." "Physical harassment" means not only inappropriate touching but also "physical interference with free movement."

Regulation No. 4000.5 also defines the complaint procedure, which can be either informal or formal. "The informal resolution process is intended to allow an individual who believes he or she has been harassed to resolve the issue through an informal or mediation process rather than the formal complaint process. A complainant may wish to select the informal process when there is a simple misunderstanding or the complainant does not wish to file a formal complaint. Examples of informal complaint

3

resolutions include clarification of a misunderstanding or an apology from the respondent and his or her assurance that he or she will cease the offending behavior."

On October 4, 2017, Knight and his mother, Aurora Knight, met with two Saddleback administrators regarding a complaint by a female student-worker, N.R., that Knight was following her around campus, trying to put his arm around her shoulder and her hand on his thigh, and invading her personal space. The matter was informally resolved, at N.R.'s request, with a mutual no-contact order, memorialized in a letter dated October 11. N.R. explained that she understood Knight's disability accounted for his conduct and she did not want to get him into trouble. Nevertheless, she wanted Knight to stop following her.

Notwithstanding the informal resolution and the no-contact order, as of October 16 Knight was still following N.R. and disrupting her work. He was peering into the staff lounge, and he made her afraid to go there alone. She was afraid to walk on campus alone and had colleagues walk with her. She "no longer want[ed] to be on campus because [she must] be escorted from place to place[.]" She considered calling in sick to work to avoid Knight.

Knight apologized in a letter to N.R. dated October 18 and at another meeting with school officials on October 19.[2] In his letter, Knight described himself as a "very lonely and depressed" person who just wanted to "make friends." Aurora Knight arranged for her son to have an attendant accompany him to classes beginning the following week. The record does not contain any further complaints by N.R.

Administrative regulation No. 4000.5 provides: "The District is committed to maintaining a safe and harassment free educational environment and may determine that serious allegations may need to be investigated even if the complaining party

---

[2] Aurora Knight may have also been present at the October 19 meeting.

4

considers the matter resolved. The District may also determine that the complaint will no longer be held informally, and instead should proceed to the formal complaint procedure stage." The formal procedure begins with a "thorough, prompt, and impartial investigation of the complaint," which includes interviews with the complaining party, the accused party, and any necessary witnesses; reviewing the relevant files; and preparing an investigative report.

Saddleback has a range of disciplinary procedures ranging from verbal reprimand through written reprimand, disciplinary probation, partial or full suspension, to expulsion. The possibility of suspension triggers a hearing process closely resembling a trial. The administrative regulations also provide a procedure for appealing to the college president a suspension or a recommendation of expulsion imposed after the hearing. Expulsion can be ordered only by the board of trustees.

At the end of October, less than two weeks after the resolution of the N.R. incident, Saddleback received notice of another complaint by a female student, M.G., who was taking a class with Knight and told the instructor Knight was following her around and taking numerous photos of her in their class, putting his hands on her while doing so. M.G. told her instructor she was coming to class late so she would not encounter Knight before class. She asked her instructor whether she could complete the course work without coming to class and told him she was considering dropping the class.

There was another meeting with Knight on November 8, 2017, this time regarding M.G. The matter was continued for an investigation. Aurora Knight presented Saddleback with a durable power of attorney for her son and demanded to be present at any meeting between Saddleback representatives and Knight.

While the investigation was proceeding, Avalos sent Knight a letter, dated December 1, 2017, formally apprising him of M.G.'s complaint, referring to intake meetings with each party, and explaining that evidence would be gathered to determine

5

whether Knight would be "deemed responsible or not responsible" for the complaint. The letter specified the complaint against Knight as "following [M.G.] around," taking "over 300 unauthorized pictures of her" and "forcefully plac[ing] your hand on her shoulder while taking a selfie with her." In the meantime, a mutual no-contact order was put in place: Knight was to delete photos of M.G. from his phone, and he and M.G. would not interact or sit next to each other in class.

On December 13, Aurora Knight responded in writing to the letter of December 1 and to the discussion at the November 8 meeting. She asserted Knight had M.G.'s permission to take the photos, which were of both of them, and denied Knight had put his hand on M.G.'s shoulder or followed her around to take photos. She referred to the meeting (presumably the one on November 8) in which all of these issues had been discussed.

M.G. was interviewed on January 17, 2018. She said Knight would ask her for a selfie at the beginning of class. At first she agreed, but when he asked her for a photo at every class, she became worried about what he was doing with them. Another student told her Knight had hundreds of photos of M.G. on his phone. He also placed his hand on her shoulder at least once while taking a photo, putting enough pressure on her neck that she went to the restroom to check whether his nails had drawn blood. Given the amount of time that had passed and the fact she no longer attended Saddleback, M.G. was not particularly interested in the investigation or its outcome.

Another meeting with Aurora Knight took place on February 12, 2018. She refused to allow Knight to participate. She insisted Knight had "perfect behavior" on campus and refused to tell him not to take selfies on campus because "this is how he makes friends." She accused Saddleback of discriminating against Knight and stated he was not wanted on campus because he is different.

6

The investigative report was finalized on March 8, 2018.[3] The report noted that "[Knight] and his mother have an expectation that our community college can provide a secure learning environment much like their high school experiences. Unfortunately, the campus and the student body is simply too large. There is an expectation that all of [Knight's] instructors explain [his] need for selfie taking, which is an unreasonable request." The report concluded that "[Knight] has a pattern of attempting to get too close within people's personal space, and is unable to understand why this is perceived as threatening to students." The report also noted Aurora Knight's refusal on Knight's behalf to stop approaching students to take photos. The report ended with a recommendation Knight be suspended for the remainder of the 2018 spring semester, until an agreement was made prohibiting him from taking selfies with others on campus.

On March 28, 2018, Avalos sent Knight a letter setting out the results of the investigation of M.G.'s complaint. The letter includes a timeline of the complaints against him, including a complaint from a faculty member regarding Knight's behavior in class on September 21, 2017, which may have preceded N.R.'s complaint.[4] The March 28 letter stated, "Based on the preponderance of the evidence, Saddleback College has found you <u>responsible</u> for taking selfies without permission and forcefully placing hands on Complainant's [i.e., M.G.'s] shoulders while taking selfies. Given the continued complaints and concerns regarding your ability to be on campus independently without causing disruptions or presenting a threat or perceived threat to our student body, Saddleback College has decided to suspend you from the South Orange County

---

[3] The investigator is not named. Knight identified this person as "Penny Skaff, Dean of Counseling Services," presumably because the December 1 letter stated that she would contact Knight to set up his interview. The author of the report personally observed Knight "struggle with his balance sitting down and getting up from a chair during meetings where he has attended." This observation led the author to conclude that M.G. was probably accurate in reporting that Knight had put his hand on her while taking the photos.

[4] The faculty member's complaint was for disruptive behavior, willful disobedience, profanity, and open defiance of authority on September 21. The instructor observed that Knight needed "constant reminding of the tasks in order to complete the work."

7

Community College District for the spring 2018 semester and recommend you take this time to seek out assistance you may need before considering re-enrolling at Saddleback College in the future. [¶] A hold has been placed on your student records, which bars you from accessing your student account. Our suspension policy is listed in Board Policy 5401 section IV, B. 4 and states, 'Removal from all classes and activities of the District and its colleges for one or more terms. During this time, the student may not be enrolled in any class or program within the District'. [¶] **If you wish to appeal this suspension you may do so by contacting my office in writing within ten working days of receipt of this letter to request a hearing conducted by the Disciplinary Hearing Panel. If you should request, this hearing will be conducted within ten days of receipt of your official request for appeal**." (Boldface in original.)

On April 3, Aurora Knight received confirmation through the office of student services that Knight could attend classes while awaiting the results of the hearing. On April 12, Avalos sent Knight a letter setting a date and time for a "disciplinary hearing," which Knight had apparently requested.[5]

Knight retained counsel, and there is a gap in the administrative record after some emails from his counsel in April and May regarding the hearing.[6] The next document is a letter from Avalos dated August 2, 2018, stating that Knight had been notified that the hearing was canceled due to witness unavailability.[7] "In lieu of suspension," Saddleback issued a "disciplinary notice stating expectations with regard to [his] future conduct."

The August 2 letter included a timeline of complaints against Knight from the 2017-2018 academic year, which largely duplicated the timeline of the March 28

---

[5] The administrative record does not reflect a discussion before April 3 of Knight's ability to attend classes despite the March 28 letter or include a written appeal and a request for a hearing.

[6] Knight's counsel demanded the "alleged inculpatory evidence supporting [his] suspension" on April 17, 2018, and an authorization to release Knight's student records was signed on April 18.

[7] No *written* notice appears in our record.

8

letter notifying Knight of Saddleback's intention to suspend him.[8]  After this list, the letter recounted Knight's decision to "appeal [his] suspension" and stated that he was allowed to attend class and register for classes pending the appeal.  The letter further stated Knight had violated South Coast Community College District's policies and regulations regarding harassment and discrimination.  The letter closed with an invitation to Knight to "submit a written statement to be retained with this correspondence in [his] student record."  Our record does not include such a written statement.

Knight petitioned for a writ of mandate on March 7, 2019.  The relief he requested was an order to "set aside"  Saddleback's "order or decisions and all findings and sanctions against [Knight]."  He alleged, "Where an accused student faces severe consequences and the determination of facts turns on credibility, the opportunity to be heard must include questioning of the complainant and adverse witnesses by the accused student or their agent in a live, adversarial, back-and-forth setting before neutral fact-finder(s), so that the accused can expose weaknesses in the witnesses' testimony."  He further alleged that (1) he was not provided notice of the potential violations of the policy sections, (2) he had no opportunity to question the complainant or adverse witnesses in front of a neutral fact-finder at a live evidentiary hearing, (3) Avalos failed to analyze and document all the available evidence  and objectively evaluate the parties' credibility, (4)

---

[8]	The timeline of the August 2 letter and those of the investigative report and letter of March 2018 differ in one respect.  The August 2 letter suggests that a third female student may have reported that Knight was following her on campus.  The letter refers to a "meeting" with a college representative, Knight, and Aurora Knight that took place on September 12, 2017, to discuss Knight's conduct in following a female student.  The administrative record does not include a separate report of this meeting.  It does include a report of an "incident" dated September 12 that may be N.R.'s initial complaint and of a meeting on October 2, which may be the same meeting that was reported with a date of October 4 and that concerned N.R.'s complaint.  The report of the September 12 incident identified the "primary violation" as "disruptive behavior, willful disobedience, profanity, open defiance of authority," the same violation that appeared on the faculty member's incident report of September 21.  The body of the report, however, concerned Knight's conduct in following a female student around campus and duplicates to some extent the circumstances of N.R.'s complaint.

The investigative report timeline begins with the faculty member's incident report of September 21, proceeds to N.R.'s complaint, dated September 25, then to the meeting on October 4, to the no-contact letter of October 11, and to the second complaint by N.R. on October 16.  There is no reference to anything occurring on September 12.  The letter of March 28, informing Knight of the intention to suspend him, likewise does not refer to an incident occurring on September 12.

evidence never provided to Knight was relied upon, and (5) a single-person investigation and decision is not a fair and impartial process for adjudicating complaints of sexual misconduct.

The trial court granted Knight's petition and ordered Saddleback "to set aside the order or decision issued against [Knight], including all findings and sanctions." The judgment did not specify the "order," "decision," "findings," or "sanctions" to be set aside.

## DISCUSSION

We begin by discussing an underlying assumption: Knight based his petition on Code of Civil Procedure section 1094.5,[9] which provides a means of "inquiring into the validity of any final administrative order or decision made as the result of a proceeding in which *by law a hearing is required to be given, evidence is required to be taken, and discretion in the determination of facts is vested in the inferior tribunal, corporation, board, or officer*[.]" (§ 1094.5, subd. (a), italics added.) The task of the superior court, like our own on appeal, is to determine "whether the respondent has proceeded without, or in excess of, jurisdiction; whether there was a fair trial; and whether there was any prejudicial abuse of discretion. Abuse of discretion is established if the respondent has not proceeded in the manner required by law, the order or decision is not supported by the findings, or the findings are not supported by the evidence." (§ 1094.5, subd. (b).) If the writ is granted, then the order or decision must be set aside. (§ 1094.5, subd. (f).) Neither we nor the trial court reweigh the evidence. We must resolve conflicts in the evidence in favor of the agency. In addition, the agency's determinations receive substantial deference from us. (*Save Our Heritage Organisation v. City of San Diego* (2015) 237 Cal.App.4th 163, 173.)

---

[9] All further statutory references are to the Code of Civil Procedure unless otherwise noted.

His resort to section 1094.5 assumes that Knight was entitled to a hearing "by law" and that Saddleback did not proceed "in the manner required by law" during this hearing. That is by no means clear. Those are questions we must resolve in this appeal.[10] Moreover, the trial court did not specify which order or decision was to be set aside. This is another question we must resolve.

In *Goss v. Lopez* (1975) 419 U.S. 565 (*Goss*), the United States Supreme Court addressed students' due process rights when suspensions up to 10 days were imposed on them.[11] The court ruled that the students had a due process right to a hearing; "[a] 10-day suspension is not *de minimis* in our view and may not be imposed in complete disregard of the Due Process Clause." (*Id.* at p. 576.) "[T]he total exclusion from the educational process for more than a trivial period, and certainly if the suspension is for 10 days, is a serious event in the life of the suspended child." (*Ibid.*)

The court then turned to the question of what process is due. The minimum amount of due process was notice and an opportunity to be heard – information that "the matter is pending" and a chance to "choose . . . whether to . . . contest." (*Goss, supra,* 419 U.S. at p. 579.) The court concluded that "[s]tudents facing temporary suspension have interests qualifying for protection of the Due Process Clause, and due process requires, in connection with a suspension of 10 days or less, that the student be given oral or written notice of the charges against him and, if he denies them, an explanation of the evidence the authorities have and an opportunity to present his side of the story." (*Id.* at p. 581.)

---

[10] If Knight wished to proceed under section 1085, the remedy would be different. The remedy would be to compel Saddleback to hold a hearing or to admit him to classes, not to set aside any orders. (§ 1085, subd. (a).)

[11] The issues in *Goss* do not exactly parallel the present case. The students in *Goss* were high school students and were required by law to attend school. They therefore had a property interest in their education that could not be taken away without due process. (*Goss, supra,* 419 U.S. at p. 574.) "A university disciplinary proceeding concerning sexual misconduct does not involve a fundamental vested right[.]" (*Doe v. University of Southern California* (2018) 29 Cal.App.5th 1212, 1231; see also *Doe v. Claremont McKenna College* (2018) 25 Cal.App.5th 1055, 1065; *Doe v. University of Southern California* (2016) 246 Cal.App.4th 221-239.)

11

"We stop short of construing the Due Process Clause to require, countrywide, that hearings in connection with short suspensions must afford the student the opportunity to secure counsel, to confront and cross-examine witnesses supporting the charge, or to call his own witnesses to verify his version of the incident.  Brief disciplinary suspensions are almost countless.  To impose in each such case even truncated trial-type procedures might well overwhelm administrative facilities in many places and, by diverting resources, cost more than it would save in educational effectiveness.  Moreover, further formalizing the suspension process and escalating its formality and adversary nature may not only make it too costly as a regular disciplinary tool but also destroy its effectiveness as part of the teaching process.  [¶]  On the other hand, requiring effective notice and informal hearing permitting the student to give his version of the events will provide a meaningful hedge against erroneous action.  At least the disciplinarian will be alerted to the existence of disputes about facts and arguments about cause and effect.  He may then determine himself to summon the accuser, permit cross-examination, and allow the student to present his own witnesses.  In more difficult cases, he may permit counsel.  In any event, his discretion will be more informed and we think the risk of error substantially reduced." (*Goss, supra,* 419 U.S. at pp. 583-585.)

*Goss* thus identified two levels of due process that apply to student discipline.  The first level is notice of the charges and of the evidence and an opportunity to state the student's side of the story, to explain.  This is the "hearing" referred to in the opinion. (*Goss, supra,* 419 U.S. at pp. 576, 579.)  The second level builds upon the first and assumes the first level has been afforded.  The second level is the formal hearing, with witnesses and cross-examination.  *Goss* clearly states that the first level is required before a suspension of 10 days or less may be imposed, but the second level of due process is not required *even before imposing a short suspension*.

In the past five years, a string of California cases has hammered out the due process requirements for a postsecondary student (invariably male) accused of sexual

assault or harassment of a female student.  These situations have become increasingly fraught as the federal government has threatened to withhold funding from schools that do not comply with Title IX strictures against sex discrimination, which includes non-consensual sexual activity.[12]  The colleges and universities receiving federal funds are charged with "prompt and equitable resolution of student . . . complaints . . . ."  (34 C.F.R. § 106.8(b).)

The most recent consensus appears to be that a student facing suspension or expulsion for non-consensual sexual activity has the right to notice of the charges.  (See, e.g., *Doe v. University of Southern California, supra*, 246 Cal.App.4th at p. 241.)  The school must follow its own policies and procedures.  (See, e.g., *Doe v. Regents of University of California* (2016) 5 Cal.App.5th 1055, 1078).  The accused student must have access to the evidence.  (See *Doe v. Regents of University of California* (2018) 28 Cal.App.5th 44, 57.)  There must be an in-person hearing, including testimony from the parties and witnesses.  (See, e.g., *Doe v. Westmont College* (2019) 34 Cal.App.5th 622, 637.)  In addition, because most cases turn on credibility (he-said, she-said), the adjudicator or adjudicators must be able to see the parties' testimony and the testimony of important witnesses so their demeanor may be observed, and the accused student must have an opportunity for cross-examination.  (See *Doe v. Allee* (2019) 30 Cal.App.5th 1036, 1069 (*Allee*); *Doe v. Occidental College* (2019) 40 Cal.App.5th 208, 224; *Doe v. University of Southern California, supra,* 29 Cal.App.5th at p. 1237.)[13]  He must also have "'a full opportunity to present his defenses.'  [Citation.]"  (*Doe v. Regents of*

---

[12]      Title IX (20 U.S.C. § 1681, subd. (a)) provides, in pertinent part, "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance . . . ."

[13]      Recognizing that a complainant may be reluctant to be in the same room with the person she is accusing of assaulting her, the courts have explained that cross-examination need not be face-to-face. Videoconferencing or some other similar technology may be employed, so long as the fact finder can see the complainant's testimony in real time.  (See, e.g., *Allee, supra,* 30 Cal.App.5th at p. 1069.)

*University of California*, *supra*, 5 Cal.App.5th at p. 1104; see also *Doe v. Claremont McKenna College, supra,* 25 Cal.App.5th at p. 1070.)

We have no doubt that if Saddleback had suspended Knight without a hearing of this kind, he would be entitled to have his suspension set aside. Absent an imminent threat, a school cannot suspend first and ask questions later. But in this case, Knight was not in any real way suspended – that is, he was not barred from campus or from his classes. The only consequence he suffered was a written reprimand. To what level of due process was he entitled under the circumstances and did he receive it? And what "order," "decision," "findings," or "sanctions" became the subject of the writ?

I.          Student N.R.

This student complained about Knight's conduct at least as of October 2017 and possibly as early as September. Two meetings were held about the complaint in October, meetings Knight attended. His mother was definitely present at one meeting and may have been present at the second one. The first meeting resulted in a mutual no-contact order, which Knight promptly, and admittedly, violated.

Knight was unquestionably "physically harassing" N.R., as that term is defined in Saddleback's regulation. He was "physically interfering" with her "free movement." He admitted to doing so.

N.R.'s complaint was resolved at the second meeting by providing an attendant to accompany Knight to class. One purpose of this attendant was, presumably, to prevent Knight from violating the order again. As this was Knight's own suggestion – or perhaps his mother's – it cannot be regarded as a sanction.

Knight received the level of due process appropriate to the situation: notice and an opportunity to explain his conduct. The "findings" – Knight's physical harassment of N.R. – were not disputed. What was disputed was his intent. No findings were made about his intent. The no-contact order was mutual and was entered into

14

voluntarily, as a result of discussions at two meetings. The record does not support a claim that Knight was deprived of due process before this order was issued.

**II.        Student M.G.**

This student's complaint had more serious consequences. Again there were two meetings to discuss Knight's behavior, one on November 8, 2017, the other on February 12, 2018. The letter of December 1, which issued interim orders while the investigation of M.G.'s complaint was taking place, required Knight to have no contact with M.G., delete her photos from his phone, and to refrain from interacting with her or sitting next to her in class. These orders are now moot, since class is over and M.G. no longer attends Saddleback. Presumably the photos have been deleted.

The next incident in the M.G. complaint process was the letter of March 28, 2018. The letter informed Knight that "Saddleback College has decided to suspend you . . . for the spring 2018 semester" and explained what that meant: "Removal from all classes and activities of the District and its colleges for one or more terms. During this time, the student may not be enrolled in any class or program within the District." In addition, a "hold" was placed on his account, "which bars you from accessing your student account." The consequences of not having access to this account are not explained.

Again, before the issuance of the March 28 letter, Knight had first-level due process: he (and his mother as his representative) received information regarding M.G.'s complaint and had more than one opportunity to respond. In fact, there were two meetings, one before and one after M.G.'s interview. Aurora Knight also wrote a letter in December, after the first meeting and after receiving the interim order of December 1, stating Knight's case point by point, demonstrating that she knew exactly what charges had been leveled against Knight. She also attended the meeting after M.G.'s interview to contest the findings, while refusing to allow Knight to attend. There could be no question that he was as thoroughly apprised as possible under the circumstance of the charges

15

against him, just as there could be no question that, if M.G.'s complaint was credited, he was physically interfering with her free movement.

Although the March 28 letter stated Saddleback had decided to "suspend" him, Knight was not "removed from all classes and activities"; he was permitted to attend classes, and he has not contended he was denied access to activities. While it was expressed rather clumsily, the purpose – and more importantly, the *effect* – of the March 28 letter appears to have been to forcefully inform Knight that Saddleback was recommending or contemplating suspension and to explain the reasons.[14] If Knight disagreed, he could appeal the recommendation, in which case he could have a full-dress hearing, as nearly as possible like a trial, the second level of due process. And, in fact, Knight disagreed, and the hearing procedure was invoked. In the meantime, however, nothing changed.

The hearing procedure collapsed after M.G. declined to testify. Saddleback recognized it could not suspend Knight without a hearing. Instead, Avalos issued a "disciplinary notice," the letter of August 2, 2018, which appears to conform to the second lowest of Saddleback's disciplinary procedures, the written reprimand.

This brings us to the question of what "order," "decision," "findings," or "sanctions" relating to the M.G. complaint should be set aside for lack of due process. But before we can address this question we need to be completely clear about what due process entails.

As described in *Goss*, when it comes to student discipline, there are two levels of due process. (*Goss, supra,* 419 U.S. at pp. 584-585.) The first level is notice of the charges and their basis and an opportunity to contest them. The second level, which assumes the student has had the first level, is the hearing with witnesses, cross-examination, and the rest.

---

[14] Avalos referred to this letter as "a notice of the intention to suspend and the grounds for the proposed suspension[.]"

16

The "findings" are recorded in the March 8 report, which gave the results of the interviews and recommended suspension.[15] This report was generated as part of the prescribed investigative process for a formal complaint, and Knight or his mother was interviewed at least twice in connection with its preparation. We agree that Knight was entitled to first-level due process (notice and an opportunity to respond) in the preparation of the report, and he appears to have received it. There were two meetings addressing the charges and Knight's response to them. He, or his mother as his representative, presented his side of the story, in the letter of December 13, which contested each of the charges against him and stated his position.

The "decisions" and "sanctions" are harder to pinpoint. The March 28 letter *said* Knight was suspended, but apparently he never was. So the "decision" to suspend him and the "sanction" of suspension cannot be set aside because they did not happen.

The last decision and sanction in the record is the August 2 letter, which substituted a written reprimand, the second lowest level of discipline, for suspension. So the question we must face is whether Knight was entitled to the second level of due process – hearing and witness confrontation – before the reprimand that he would have been entitled to before he could have been suspended?

We have found no published cases holding that a student is entitled to this level of due process before receiving a written reprimand, and *Goss* militates against such a requirement. In *Goss*, it will be recalled, the basic due process *for a suspension* was notice and an opportunity to explain. If there are "disputes about facts and arguments about cause and effect[,]" then the disciplinarian *may* want to go to the next level – the presentation of witnesses and cross-examination. (*Goss, supra,* 419 U.S. at pp. 584-585.)

---

[15] The interim order reflected in the December 1 letter – no contact, delete the photos – is, as we have already stated, moot because M.G. no longer attends the class or the college. We assume the photos were deleted in December, as ordered.

17

From the more recent published cases dealing with suspension and expulsion from postsecondary schools, we have distilled the following process: (1) a student is accused of misconduct; (2) the school lets the student know what the accusation is and how he/she is alleged to have violated school rules (notice) and gives him/her the opportunity to explain or contest the accusation (first-level due process); (3) the school investigates; (4) the school informs the student that, after completing the investigation (including his/her version of events), it is considering suspension (or expulsion); and (5) the student decides whether to object to being suspended (or expelled). If the student does object, then there must be (6) a hearing, live testimony, and the full panoply of trial-like procedures (second-level due process). That second level of due process becomes mandatory only before the penalty of suspension can be imposed upon an objecting student.

In effect, Knight is arguing second-level due process is required *before the school can inform the student that it is considering suspension*, that is, before step (4). Knight has not offered us any cases supporting that position.

Knight also argues that he had no opportunity to contest the August 2 letter, that it was put in his file without due process. The August 2 letter represented the culmination of all the events that had taken place since the previous October. It contained nothing new. All the circumstances leading up to the written reprimand had been thoroughly discussed with Knight and his mother over the intervening months. These same circumstances formed the basis of the March 28 suspension letter, which prompted Knight to demand a hearing. Knight had received first-level due process – notice of the charges and a chance to present his evidence – well in advance of the August 2 letter. There was no requirement to have further discussions in July about events from the previous fall and winter that had already been thoroughly discussed.

In arguing he had no opportunity to present his evidence, Knight simply ignores the two meetings he and then his mother had with Saddleback administrators.

18

Aurora Knight's December 13 letter refers to the meeting of November 8 and states Knight's side of the story point by point. There was another meeting on February 12, during which Aurora Knight again presented Knight's version of events and categorically refused to tell him not to approach people for selfies.

Moreover, Knight had another opportunity to respond with his side of the story, an opportunity he declined. Education Code section 76233 provides: "Whenever there is included in any student record information concerning any disciplinary action taken by community college personnel in connection with the student, the student shall be allowed to include in such record a written statement or response concerning the disciplinary action." The August 2 letter invited Knight to submit such a written statement, but he did not. He sued instead.[16]

Knight argues that the presence of the August 2 reprimand letter in his confidential student record "adversely affects [his] life." Therefore, before the letter can go into the record, Knight must have a hearing with live testimony and cross-examination, i.e., second-level due process.

According to administrative regulation No. 5401, a written reprimand "[b]ecomes part of the student file for a minimum of five years or longer at the discretion of the disciplinary officer and is considered in the event of future violations." It is true that the letter will stay in Knight's student record. But we cannot see that this is unfair to him. His mother, speaking on his behalf, categorically refused to halt his habit of approaching students on campus to take photos. Campus administrators in charge of dealing with harassment are entitled to know Knight's history if another such complaint

---

[16]    Education Code section 76232 provides a process by which a student may correct or remove inaccurate information in his or her student records. This process ultimately involves taking the matter to the governing board of the community college district, whose decision is final. (Ed. Code, § 76232, subd. (c).) If the student receives an unfavorable decision from the governing board, he or she may still object to the information in writing. (Ed. Code, § 76232, subd. (d).) Thus the Education Code provides yet another opportunity for a student to record his or her version of events.

19

is made.  There is a significant difference for disciplinary purposes between a first-time offense and a pattern of similar conduct.

There is also an important difference between this case and the typical college misconduct cases cited in this opinion.  In most of those cases, the facts are disputed; they are "he-said-she-said" cases in which credibility of both parties and witnesses plays a large part.  In this case, however, there was no essential dispute about the facts.  Knight was following N.R., even after he had agreed not to do so.  He had taken enough photos of M.G. to make her uneasy about them and him.[17]  The dispute here was ultimately about whether these students were justified in finding his conduct unsettling and in asking to have it stopped.

The investigative report concluded Knight had a "pattern of attempting to get too close within people's personal space" and he could not "understand why this is perceived as threatening to students."  The report also observed that a strategy that may have worked well in high school – approaching people and asking for photos – was not suited to the college environment.  Knight's refusal to stop this practice – and his mother's insistence that his right to make friends overrode the disquiet it caused – effectively decided the outcome.  Knight was violating the school's policy against harassment, and he had to be warned that he faced more severe sanctions if he continued on this course.

We conclude that first-level due process – notice and an opportunity to respond – is required before a written reprimand may be placed in a student's record.[18]  We also conclude that Knight received this level of due process.  Saddleback did not need to afford him second-level due process before issuing a written reprimand.

---

[17]  There was a dispute about whether Knight had touched M.G.  The investigator resolved this dispute in M.G.'s favor after observing Knight struggling to keep his balance to sit down and to get up from a chair.  As stated above, we do not reweigh the evidence upon which the school based its determination.  (See *Save Our Heritage Organisation v. City of San Diego*, *supra,* 237 Cal.App.4th at p. 173.)

[18]  See Education Code sections 76242 et. seq. for privacy protections afforded to student records.

## DISPOSITION

The judgment is reversed.  Respondents are to recover their costs on appeal.


                                        BEDSWORTH, ACTING P. J.

WE CONCUR:


THOMPSON, J.


GOETHALS, J.