Filed 3/8/24 (unmodified opn. attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| MATTHEW BOERMEESTER,<br><br>Plaintiff and Appellant,<br><br>v.<br><br>AINSLEY CARRY et al.,<br><br>Defendants and Respondents. | B290675<br><br>(Los Angeles County<br>Super. Ct. No. BS170473)<br><br>ORDER MODIFYING OPINION<br><br>[NO CHANGE IN JUDGMENT] |

BY THE COURT:

It is ordered that the opinion filed herein on March 7, 2024, be modified as follows:

On page 32 of the opinion, the following sentence should be added to the end of the Disposition:

Appellant Boermeester to pay costs on appeal.

There is no change in the judgment.

_____
STRATTON, P. J.          WILEY, J.          VIRAMONTES, J.

Filed 3/7/24; On remand (unmodified opinion)
**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| MATTHEW BOERMEESTER, | B290675 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. BS170473) |
| v. | |
| AINSLEY CARRY et al., | |
| Defendants and Respondents. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Amy D. Hogue, Judge.  Affirmed.

Hathaway Parker, Mark M. Hathaway and Jenna E. Parker for Plaintiff and Appellant.

Young & Zinn, Julie Arias Young, Karen J. Pazzani; Horvitz & Levy, Mark A. Kressel, Scott P. Dixler, Beth J. Jay, Jeremy B. Rosen; Pazzani & Sandhu and Karen J. Pazzani for Defendants and Respondents.

————————————

Following his expulsion from the University of Southern California (USC) for engaging in intimate partner violence, Matthew Boermeester filed a petition for writ of administrative mandate in the superior court pursuant to Code of Civil Procedure section 1094.5. The superior court denied the petition, and Boermeester appealed. In a divided opinion, we held that Boermeester had a right to cross-examine adverse witnesses at the live hearing at which USC adjudicated the allegation and we reversed the trial court's judgment. The California Supreme Court granted USC's petition for review (*Boermeester v. Carry* (May 28, 2020, B290675), opn. ordered nonpub. Sept. 16, 2020), reversed our opinion, and held that Boermeester did not have such a right. (*Boermeester v. Carry* (2023) 15 Cal.5th 72 (*Boermeester*).) The Supreme Court then remanded this matter to us with clear instructions "to determine in the first instance the remaining claims Boermeester raised on appeal that the Court of Appeal expressly declined to reach." (*Id*. at p. 98.) We are bound by these instructions. (See *Griset v. Fair Political Practices Com*. (2001) 25 Cal.4th 688, 701.)

Following remand, the parties filed supplemental briefs. Boermeester contends USC's decision is not supported by substantial evidence; USC's use of a combined investigator-adjudicator procedure denied him fair process; and USC's appeal process amplified the harm from the use of an investigator-adjudicator. We find substantial evidence supports USC's decision and find no denial of fair process in USC's use of an investigator-adjudicator or in its appeals process, either structurally or as conducted in this case. We affirm the denial of the writ.

# BACKGROUND

In 2016 and 2017, Boermeester was a member of the USC football team and Jane Roe was a member of USC's women's tennis team. Boermeester and Roe dated from March 2016 to approximately October 2016. On January 21, 2017, after midnight, three male USC students heard screaming in the alley behind their residence. Two of them looked outside and observed Boermeester put his hand on Roe's neck and push her against a wall. One of the men, MB2, went outside, which broke up the encounter and resulted in Boermeester and Roe walking away. The two other men, TS and DH, lived in the other half of Roe's duplex and spoke with her soon after the incident.

One or more of the men reported this incident to the USC men's tennis coach, who reported it to USC's Title IX Coordinator, Gretchen Means. USC began an investigation into the incident. Means and USC's Title IX Investigator Lauren Helsper met with Roe on January 23, 2017. We previously summarized Roe's statements as follows:

Roe reported she spent the day with Boermeester on Friday, January 20, 2017. He called to ask her to pick him up from a party at approximately 12:30 or 1:00 a.m. on January 21, 2017. She did, and after getting food, they returned to her home. Boermeester was the drunkest she had ever seen. He yelled in the alley behind her house, trying to be funny.

Roe had her dog Ziggy with her. Boermeester wanted her to drop Ziggy's leash to allow him to run in the alley. He grabbed the back of Roe's hair hard and said "drop the fucking leash." Roe refused. Boermeester responded by increasing his hold on Roe's hair, causing her to drop the leash because it "hurt."

3

Boermeester then grabbed Roe "tight" by the neck, causing her to cough. He laughed and let go. He grabbed her by the neck twice more and pushed her hard against a concrete wall that ran along the alley behind her duplex. Roe's head hurt after she hit the wall.

Three USC students, DH, TS, and MB2, exited their apartments. Roe believed they were awakened by the loud yelling. When they asked after Roe, Boermeester told them that he and Roe were just "playing around." DH and TS, who lived on the other side of Roe in the duplex, took her into their apartment. Boermeester was asleep when she returned to her place.

The next day, Roe told Boermeester that he scared DH and TS because "it looked really bad when you pushed me and it looked really bad with your hand around my neck." He replied, "it was a joke, we were messing around, tell them to calm down" and added, "tell them you're into that," implying that it was foreplay. When Roe asked him, "what if you hurt me bad? Would you feel bad? If you were playing around and it hurt?" Boermeester told her, "no" because it would have been "brought on by" her.

The Title IX coordinator explained Roe had the option to request an avoidance of contact order (AOC) prohibiting Boermeester from contacting her. Roe indicated she wanted the AOC as well as temporary emergency housing because Boermeester had a key to her house. The investigator noted Roe was crying throughout the meeting.

Roe acknowledged she was in a "bad situation" but was conflicted about what to do because she still cared for Boermeester. Roe indicated she did not want to participate in an investigation and did not want Boermeester to be charged with

4

anything other than the January 21, 2017 incident. She was informed the Title IX office was obligated to investigate and could proceed without her consent. Boermeester was charged with the January 21, 2017 incident of intimate partner violence for which there were eyewitnesses.

On January 26, 2017, USC notified Boermeester of an investigation into the events of January 21, 2017, and that he may have violated USC's sexual misconduct policy by committing intimate partner violence. He was placed on interim suspension and received an AOC letter.

As we previously summarized, that same day Roe exchanged a series of text messages with the investigator stating, I am "pretty freaked out about today. I know I've said this a lot but I really can't emphasis [*sic*] enough that you guys please please make it clear that I did not bring this forward that I want nothing to do with it and I'm not pressing any charges." She further stated, "He can't know I made a statement. Can you not tell him I made a statement[?] Like he can't know I met with you guys." The investigator assured her Boermeester would be advised the investigation was initiated by the Title IX office and he would not be made aware of her statement until the time of the evidence review.

On January 30, 2017, Roe and her advisor met with the investigator. We summarized that meeting as follows:

Roe indicated she had reservations about the investigation because she felt as though her voice was not heard and that it was more about "burning him" than her wellbeing. Roe explained she thought she was in a supportive environment when she initially met with the Title IX office and so she freely shared her story. Although she understood the Title IX office was "trying to

5

do the right thing," it has made things for her more "difficult." Roe felt bullied by the process and no longer "fully believe[d]" many of the statements she initially made to the Title IX office.

Roe also requested the AOC be lifted because she had changed her mind. She requested the AOC during her first meeting because she did not "trust" that it would be clearly conveyed to Boermeester that the investigation was initiated by the Title IX office, not her. She did not want Boermeester to be "mad" at her. She remarked "at the end of the day, he is like my best friend so it is like you are taking that away too." She explained, "you think this is to protect me. Feels like I lost control on everything and I feel like you are controlling who I can talk to." Roe stated that she did not feel she was in danger. She was upset they could not speak to each other. She believed that the investigation was too harsh and that instead, Boermeester should be mandated to go to counseling and be placed on probation.[1]

Boermeester was also interviewed by USC on January 30, 2017. We previously summarized his statement concerning the incident as follows:

Boermeester generally confirmed the events of January 21, 2017, as Roe had described them; however, he denied intending to hurt her.

---

[1] The next day, Roe texted the investigator, "Will I know tomorrow if I can get rid of my statement because I really don't want it used and I don't even think it is fair because I still disagree with somethings I said so to use it wouldn't be accurate and I just have been stressing about if it's being used or not so will [the coordinator] have an answer for me tomorrow?"

He reported he and Roe ate at the Cheesecake Factory at approximately 4:00 p.m. Later that night, he text messaged Roe to pick him up from a party because he was unable to drive. He had three glasses of wine at the restaurant and four to five beers at the party. When they arrived at Roe's home after picking up food, they began playfully throwing french fries at one another.

Boermeester wanted to watch Roe's dog run around so he asked her to let the dog go. They were standing by a wall when he instructed her to release the dog. He acknowledged he put his hand around her neck while she stood against the wall, but denied they were arguing or that he was angry. He also denied choking her or slamming her head against the wall. He believed Roe felt safe with him. He asserted he did not have a tight grip on her. Boermeester believed the eyewitnesses misinterpreted what they saw. He explained he and Roe sometimes put their hands on each other's necks during sex.

USC's Title IX investigator interviewed 16 people in total, including the eyewitnesses, Roe's roommates and friends, and Boermeester's ex-girlfriend. We summarized the eyewitnesses' statements as follows:

MB2 is Roe's neighbor. He initially reported he did not see any physical contact between Roe and Boermeester. He explained he heard an argument between a man and a woman about a dog. When he walked outside to take out his trash and see what was happening, "it kinda settled a little bit." Roe approached him a few days later to ensure he did not get the wrong impression.

One month later, MB2 called the investigator to admit he had not been truthful in his initial statement because he was trying to "protect" Roe's wishes to "keep it on the down low" and

7

"downplay" the incident. He explained Boermeester's attorney attempted to speak with him at his home in March 2017. He told the attorney what he initially told the Title IX investigator. However, he decided, "the lawyer coming to speak to me, finding my apartment, I don't want to keep this any longer, perpetuating this lie."

During a second interview, MB2 reported he heard laughing and screaming sounds coming from the alley by his home, which initially seemed playful. The noise then changed to what sounded like a male trying to "assert his dominance" over a female. MB2 looked into the alley and saw Boermeester standing in front of Roe with both hands around her neck. He then pushed her into the alley wall and she began to make "gagging" noises. MB2 added, "once he put his arms around her the first time she wasn't saying anything." MB2 believed, "this guy is violent. He domestically was abusing her." He stated, "truth is I really wanted to beat the shit out of this guy." Because of what he saw, MB2 grabbed a trash bag and went outside. He asked them how things were going, which "broke it up." Afterwards, Boermeester and Roe walked back to her apartment.

DH is a member of the USC men's tennis team and Roe's neighbor. He was reluctant to participate in the investigation but described what he saw on the night of January 21, 2017. He reported he heard screaming. He heard a male voice yelling loudly and a female voice talking but could not make out what they were saying. He looked outside and saw Roe and Boermeester standing by the wall. He noticed Roe's dog running in the alley, which made him realize something was wrong because Roe did not allow her dog to run freely. He saw Roe

pinned against the wall by Boermeester, who had his hand around her chest/neck. DH did not see or hear Roe hit the wall.

TS is also a member of the USC men's tennis team and is DH's roommate. He reported DH woke him up, urgently stating, "we gotta go downstairs, [Boermeester] is hitting [Roe]." When they got downstairs, DH asked to speak to Roe. Boermeester walked back to Roe's house. DH tried to convince her to spend the night at their apartment. DH observed Roe was "playing casual at first" and tried to "downplay it." When DH confronted her about Boermeester's arm around her throat, she rationalized it by saying, "he's just drunk." About 15 to 20 minutes later, Roe returned to her home, crying. She then texted that Boermeester was asleep and stated, "I am safe. Thanks for looking out for me." TS and DH reported the incident the next day to the men's tennis coach.

We also noted that "Roe's roommates and friends uniformly reported that Roe and Boermeester's relationship was volatile, but they did not personally witness any physical violence between them."

In addition to interviewing witnesses, the investigator obtained video of the incident from a camera located in the alley about two buildings away from Roe's duplex. The recording is silent and grainy. There is no dispute that the video shows Boermeester and Roe in the alley after midnight on January 21, 2017. We found that the video supported "the trial court's description of the events" as follows:

"At 12:16:16 a.m., the video shows Petitioner shoving Roe from the area adjacent to the house into the alleyway. At 12:16:50, Petitioner appears to be holding Roe's neck or upper body area. At 12:17:12, Petitioner grabs Roe by the neck and

9

pushes her toward the wall of the alley.  At 12:17:13 and 12:17:14, Roe's head and body arch backwards.  Between 12:17:16 and 12:17:26, Petitioner and Roe are against the wall and barely visible from the camera.  At 12:17:26, Petitioner backs away from the wall and re-enters the camera's view.  At 12:17:28, Roe re-enters the camera's view.  Roe and Petitioner proceed to push each other.  At 12:17:38, Petitioner moves toward Roe and appears to be pushing her against the wall.  At 12:17:40, a dog can be seen running across the alley.  At 12:17:57, a third party enters the camera's view and walks in the direction of Petitioner and Roe.  At that moment, Petitioner and Roe walk away from the wall and back towards the house.  At 12:18:19, the third party walks over to the dumpster, places a trash bag inside, and walks back toward the house."

Under USC's Misconduct Policy, Boermeester was entitled to review the evidence collected, including witness statements, physical and documentary evidence, and audio/visual material before USC made any findings of fact.  Also before findings of fact were made, Boermeester was entitled to submit cross-examination questions to be asked of the other party by the Title IX Coordinator at an Evidence Hearing.  Boermeester was also entitled to appear at an Evidence Hearing himself.  The Evidence Hearing is each party's separate opportunity to respond to the evidence collected.  At the Evidence Hearing, the Title IX Coordinator will ask each party the questions submitted by the other.  The Title IX Coordinator has the responsibility to exclude any questions that are inflammatory, argumentative, or relate to character evidence or non-relevant sexual history.  Boermeester did not submit questions for cross-examination.  He elected to

submit a written statement rather than participate in the Evidentiary Hearing.

USC's investigation, called a Summary Administrative Review (SAR), concluded on March 22, 2017. Helsper prepared a 78-page report of the review. On April 27, 2017, USC informed Boermeester and Roe that it had determined that Boermeester was responsible for the charged conduct. On May 2, 2017, the Misconduct Sanctioning Panel recommended expulsion.

Boermeester appealed to the Title IX Appeal Panel. The Panel found, among other things, that the findings of fact in the SAR were supported by substantial evidence. The Panel recommended a two-year suspension because Boermeester's conduct could have been reckless rather than intentional. The vice-president for student affairs, Ainsley Carry, rejected the appellate panel's recommendation and affirmed the decision to expel Boermeester, reasoning the sanction was appropriate under the sexual misconduct policy regardless of whether or not Boermeester intended to harm Roe.

Boermeester filed a petition for writ of administrative mandate in the superior court. The petition was denied, and this appeal followed.

We briefly summarize the issues which we did reach in our prior opinion, and which are not affected by the California Supreme Court's ruling in *Boermeester*, *supra*, 15 Cal.5th 72. We found meritless Boermeester's claim that he did not receive notice of the allegations against him. We also found meritless his claim that an interim suspension was improperly imposed. We noted: "To the extent Boermeester argues USC's Title IX office was biased against him, an argument that appears throughout his appellate briefs, he has presented no legal or factual basis to

11

support this argument other than to say its decisions were not in his favor. . . . Boermeester also complains Roe was not provided proper notice she was a suspected victim and intended reporting party in the proceedings. Boermeester lacks standing to assert Roe's rights in this matter." (*Boermeester v. Carry, supra*, B290675.) These decided issues are outside the scope of the remand and we cannot and do not reconsider them.

We expressly declined to reach only two issues: 1) whether USC's policy was unfair because the Title IX investigator held the dual roles of investigator and adjudicator; and 2) whether substantial evidence supported USC's findings that Boermeester violated its intimate partner violence policy. We mentioned that there were "other claims of error," which we declined to reach. Based on a review of Boermeester's original opening brief on appeal, we find that there was at most one other claim of error which we did not reach: Boermeester's claim that USC's limited appellate review did not provide a check on the investigative process.[2] These are the only three claims we consider now.

---

[2] Even without the Supreme Court's instructions, we would not consider any other claims without an explanation of why they were not raised in the original briefing. (See *Dahms v. Downtown Pomona Property & Business Improvement Dist.* (2009) 174 Cal.App.4th 708, 711, fn. 1 ["any arguments raised in the supplemental briefs that could have been raised in the parties' original briefs will not be considered"]; accord, *People v. Vasquez* (2022) 74 Cal.App.5th 1021, 1033, fn. 10 [disregarding contention in supplemental brief that party could have raised before the previous Court of Appeal decision].)

## DISCUSSION

A. *The Standard of Review Was Decided in Our Prior Opinion.*

In his initial brief on appeal, Boermeester contended that the disciplinary hearing involved vested fundamental rights, which required the trial court to not only examine the administrative record for errors of law but also exercise its independent judgment based upon the evidence disclosed in a limited trial de novo. Boermeester claimed that because the trial court did not recognize this, remand was required to permit the trial court to conduct the appropriate review. USC contended that education is not a vested fundamental right, the trial court correctly reviewed the evidence for substantial evidence, and we should do the same.

Although we did not expressly address the issue of whether education is a vested fundamental right, we decided the issue adversely to Boermeester when we held that we review USC's substantive decisions and factual findings for substantial evidence. We cited *Doe v. University of Southern California* (2016) 246 Cal.App.4th 221 to support our holding. The discussion of the standard of review in that case makes clear that *Doe* is applying the standard of review applicable to cases not involving a fundamental vested right.

In his supplemental brief on remand, Boermeester again argues that USC's administrative decision substantially affected his vested fundamental rights and so we should reverse the trial court ruling and remand the matter to the trial court to review the evidence independently. Because we decided this issue in our prior opinion, it is outside the scope of the remand. Further, Boermeester does not cite new authority issued after our initial decision in this matter or after the Supreme Court's decision, so

13

even if we had jurisdiction to reconsider this issue, Boermeester has given us no reason to do so.

Boermeester does point out that the Supreme Court recognized the value and importance of a college education, and the stigma of expulsion, but we note the Court simply ended the discussion by stating: "For these reasons, we find that a student's interest in completing a postsecondary education at a private university is analogous to an individual's interest in continuing membership in a private organization that impacts the individual's ability to practice his or her chosen profession. Our common law doctrine of fair procedure therefore applies in determining whether USC's disciplinary procedures were fair." (*Boermeester, supra,* 15 Cal.5th at p. 89.) We do not view this discussion as an indirect indication that we should reconsider our previous ruling on the standard of review, particularly given the Court's explicit directions that we should consider issues we expressly declined to reach.[3]

---

[3] Our conclusion is reinforced by the fact that Divisions Three and Seven of this District Court of Appeal have expressly held that college disciplinary decisions do not involve a vested fundamental right. (*Doe v. University of Southern California* (2018) 29 Cal.App.5th 1212, 1231 ["A university disciplinary proceeding concerning sexual misconduct does not involve a fundamental vested right."]; *Doe v. Occidental College* (2019) 37 Cal.App.5th 1003, 1018 ["California cases reviewing colleges' disciplinary decisions concerning student sexual misconduct have repeatedly applied the substantial evidence standard because the decisions there 'do not " 'involv[e] a fundamental vested right.' " ' "].) Division One has indicated that it is not a fundamental right by its selection of the standard of review. (See

14

B.      *Substantial Evidence Supports USC's Findings.*

Boermeester contends that USC's finding of a violation is not supported by substantial evidence because 1) there was no physical evidence that Roe suffered physical harm from the incident; and 2) the evidence that he grabbed her and pushed her into a wall is uncorroborated hearsay.

The substantial evidence standard of review is deferential. " '[W]e are not free to indulge in an independent reconstruction of the events: our view of the record must be circumscribed by a limited appellate review of University proceedings.' We examine all relevant evidence in the administrative record and view that evidence in the light most favorable to the judgment, resolving all conflicts in the evidence and drawing all inferences in support of the judgment." (*Do v. Regents of University of California* (2013) 216 Cal.App.4th 1474, 1490.) "Only if no reasonable person could reach the conclusion reached by the administrative agency, based on the entire record before it, will a court conclude that the agency's findings are not supported by substantial evidence." (*Ibid*.)

Boermeester points to evidence that Roe had no bruising, scrapes, or similar markings when examined by USC two days after the incident. We agree that it is undisputed that Roe had "no bruises or anything else anywhere on [her] body" when examined by USC. Boermeester, however, points to nothing in USC's definition of physical harm that requires visible physical marks that last at least 48 hours.

---

*Doe v. Claremont McKenna College* (2018) 25 Cal.App.5th 1055, 1065.)

15

As for the affirmative evidence of physical harm, Roe stated that it hurt when Boermeester grabbed her hair and when he hit her head against the wall.  He pushed on her neck hard enough to make her cough.

Pushing on a person's neck hard enough to prompt coughing is an act causing physical harm, whether or not it leaves lasting visible marks on the skin.  Similarly, head pain which lasts after the moment of impact is physical harm, whether or not it leaves lasting visible marks on the scalp.[4]

Boermeester contends, however, that USC's factual finding that he grabbed Roe by the neck and pushed her head into a wall is also not supported by substantial evidence because USC relied on uncorroborated hearsay, specifically 1) "uncorroborated hearsay summaries of what witnesses may have said during private, unrecorded interviews with USC's investigator and Title IX Coordinator" and 2) the "uncorroborated hearsay summaries [which] themselves contain various levels of uncorroborated

---

[4]     The Supreme Court has indicated that physical pain qualifies as physical harm under USC's policies.  As relevant, the Court wrote: "Shortly after the incident occurred, Roe told the Title IX investigator that Boermeester had physically harmed her.  Specifically, Roe said that it 'hurt' when Boermeester grabbed the back of her hair 'hard' and told her to drop her dog's leash; that it 'hurt' when Boermeester grabbed the front of her throat and neck, causing her to cough; and that her 'head hurt' after Boermeester grabbed her by the neck again and pushed her head 'hard,' causing her head to hit the alleyway wall. . . . USC could have concluded that Boermeester 'caus[ed] physical harm' to Roe and, thus, violated its policy against intimate partner violence." (*Boermeester, supra,* 15 Cal.5th at p. 97.)

16

hearsay, including what witnesses supposedly said they heard from [Roe] or other witnesses."

The legal term "hearsay" has no significance in this appeal. Formal evidentiary rules applicable in court are not required in administrative proceedings like USC's. (*Doe v. Regents of University of California* (2018) 28 Cal.App.5th 44, 56 [formal rules of evidence do not apply in university disciplinary proceedings]; *Floresta, Inc. v. City Council* (1961) 190 Cal.App.2d 599, 608 ["rules of admissibility of evidence do not bind administrative agencies"].) Indeed, Boermeester conceded in his administrative appeal that "this is not a court of law and that the rules of evidence do not apply." Boermeester's belated reliance on *In re Lucero L.* (2000) 22 Cal.4th 1227 in his briefing on remand is misplaced. That case involves a dependency hearing in juvenile court, a proceeding which provides far more procedural protections than does an administrative hearing conducted by a university.

Boermeester's first "hearsay" claim appears to be that the investigator and coordinator could not rely on their own notes; he implies that they were required to make audio or video recordings of the witness interviews. Boermeester has cited no case law holding that an administrative body must record witness interviews. Written notes can provide an adequate record. (See *Andersen v. Regents of the University of California* (1972) 22 Cal.App.3d 763, 772–773 [four-page notes of administrative proceeding acceptable for administrative record in student discipline case].)

It is not clear what Boermeester means by "uncorroborated" summaries. If Boermeester means that Helsper did not confirm with witnesses that her summaries were

17

accurate, we previously found that the "investigator made it a general practice to reread the statement to the person after the interview to confirm accuracy." The record shows that Helsper read the summaries of the three key witnesses from the night of the incident to them and they confirmed the summaries were accurate. A cursory review of other witness summaries indicates this was Helsper's common practice. Both Boermeester and Roe were permitted to review and comment on the notes of their own interviews.

As for the contents of the interviewed witnesses' statements, we are not aware of any requirement that a witness statement be corroborated in order to be considered reliable enough to constitute substantial evidence. (See *Casella v. SouthWest Dealer Services, Inc.* (2007) 157 Cal.App.4th 1127, 1144 ["Even the uncorroborated testimony of a single witness may constitute substantial evidence."].)

Boermeester's claim that the witnesses were repeating "hearsay" statements by other witnesses is forfeited by Boermeester's failure to identify specific statements and to provide an argument that the "hearsay" statement is not reliable.[5] (*United Grand Corp. v. Malibu Hillbillies, LLC* (2019)

---

[5] To be clear, the ordinary rules of evidence do not apply and there is no bar against hearsay. Generally, the bar against statements is based on the premise that such statements can be unreliable. Thus, read generously, Boermeester's "hearsay" claim can be understood as a claim that the statements are unreliable. Boermeester's claim could also be understood as a claim that the witnesses lacked personal knowledge. These are the concerns present in *Doe v. University of Southern California, supra,* 246 Cal.App.4th at page 253, not any technical violation of the inapplicable hearsay rule. In this case however, any such claims

36 Cal.App.5th 142, 153 (*United Grand*).)  Even under the formal rules of evidence, there are many exceptions to the hearsay rule; those exceptions exist because some out-of-court statements are deemed reliable because of the circumstances under which they were uttered.

Boermeester's fundamental claim appears to be that no oral witness statements can "be deemed weightier or more reliable than the written statements submitted personally by [Roe] and [him].  In her written statements, [Roe] disputed that she ever made statements indicating [he] hit her head against a wall, and to this day, she denies that any alleged intimate partner violence occurred."  He contends the "security video is inconclusive but is consistent with" his and Roe's statements "that no violence occurred."  Boermeester further contends that the investigator's "speculation and opinion of [Roe] as a victim of domestic violence who 'recanted' cannot possibly be deemed substantial evidence, especially in light of [Roe's] repeated assertions that she is not a victim of domestic violence and would never stand for physical or verbal abuse perpetrated by [him] or anyone."

As we have previously explained, there is nothing questionable about choosing to find a victim's initial statement more credible than a later recantation of that statement, particularly in domestic violence cases.  This is a point repeated by the Supreme Court in its analysis of this case.  (*Boermeester*, *supra*, 15 Cal.5th at p. 98 ["it is not uncommon for victims of intimate partner violence to recant.  Roe's post-incident

---

by Boermeester would be forfeited by the failure to identify specific statements and provide supporting argument.  (*United Grand, supra,* 36 Cal.App.5th at p. 153.)

19

communications with USC's Title IX office and her friends indicate that she feared retaliation and felt a sense of loyalty towards Boermeester, either of which may have motivated her later recantation."].)  There is likewise nothing questionable about finding a victim more credible than the alleged attacker. Relatedly, there is an exception to the hearsay rule for spontaneous statements made "while the declarant was under the stress of excitement caused by" an event and so made at or near the time of an exciting event (Evid. Code, § 1240) because such statements are considered more reliable than those made after time for reflection.  This, too, supports USC's decision to treat Roe's initial oral statement as the more credible of her two accounts.

Three courts have now viewed the security video and all have found it consistent with the victim's initial oral account. (*Boermeester*, *supra*, 15 Cal.5th at p. 97 ["The video of the incident—though grainy and soundless—is consistent with Roe's initial account.  (*Boermeester v. Carry*, *supra*, B290675.)"].)

Finally, we note Roe's initial oral statement is also corroborated by Boermeester's admission that he had his hands on [her] neck and had her against the alleyway wall (see *Boermeester*, *supra*, 15 Cal.5th at pp. 97–98) and the statements of the two eyewitnesses.  DH stated he heard screaming, looked out the window and saw that Boermeester "had [Roe] pinned against the wall with his hand on her chest/neck."  He saw Boermeester "holding her against the wall."  MB2 similarly stated he heard screaming, looked outside and saw "a guy standing around [Roe] with both of his hands around her neck. He was pushing [Roe] against the wall and [she] was 'gagging.' "

20

Substantial evidence supports USC's finding that Boermeester committed intimate partner violence.

C.      *A Combined Investigator-Adjudicator Process, Without More, Does Not Deny Fair Process.*

In his original brief, Boermeester contended "it is simply too perilous to allow a single individual to act in the overlapping and conflicting capacities as investigator, victim advocate, prosecutor, and tribunal, deciding credibility and relevancy of evidence, making findings, and imposing discipline. [(*Doe v. Allee* (2019) 30 Cal.App.5th 1036, 1068.)] Likewise, delegating a single investigator/adjudicator to implement an accused student's right to cross-examination is 'incompatible with adversarial questioning designed to uncover the truth. It is simply an extension of the investigation and prosecution itself.' [(*Ibid.*)]" Boermeester relied solely on *Allee*, and his claim of error mirrored the argument in that case: an investigator-adjudicator cannot properly perform adversarial cross-examination at a live evidentiary hearing.

In his supplemental brief on remand, Boermeester continues to rely solely on *Allee*, now disapproved in part by *Boermeester*, *supra*, 15 Cal.5th 72. Boermeester contends: "In a student disciplinary adjudication, the factfinder cannot be an individual with the 'divided and inconsistent roles,' such as those occupied by the Title IX investigator at USC, who exercises 'unfettered discretion to chart the course and scope of the investigation and to determine credibility in questionable ways.' [(*Doe v. Allee*, *supra*, 30 Cal.App.5th at pp. 1069–1070.)] [¶] In *Allee*, all the administrative findings and decisions were made by the investigator, USC's Dr. [Kegan] Allee, whose determination was based on 'all evidence she deemed relevant, and taking into

account her determination as to the parties' credibility.' (*Ibid*.) This process, the *Allee* [c]ourt ruled, was unfair."

In fact, the *Allee* court recognized that "an administrative procedure in which a single individual or body investigates and adjudicates does not, 'without more,' violate due process." (*Doe v. Allee, supra*, 30 Cal.App.5th at p. 1067 (*Allee*).) The court found "more" occurs primarily in situations where the accused had a right to confront and cross-examine adverse witnesses. The court believed that "the performance of this key function is simply too important to entrust to the [dual role] Title IX investigator in USC's procedure." (*Id*. at p. 1068.) The court found the "notion that a single individual, acting in these overlapping and conflicting capacities, is capable of effectively implementing an accused student's right of cross-examination by posing prepared questions to witnesses in the course of the investigation ignores the fundamental nature of cross-examination: adversarial questioning at an in-person hearing at which a neutral fact finder can observe and assess the witness' credibility. [Citations.] . . . [A] right of 'cross-examination' implemented by a single individual acting as investigator, prosecutor, fact finder and sentencer, is incompatible with adversarial questioning designed to uncover the truth." (*Ibid*.)

In *Boermeester*, however, the Supreme Court expressly disapproved *Allee*'s holding concerning live cross-examination. If we assume that *Allee* has any continuing vitality on the issue of fair process after *Boermeester*, the *Allee* opinion, shorn of all references to the right to live cross-examination, would consist simply of a discussion concerning USC's investigatory policy *and* practices. It is not clear that the *Allee* court would have found a lack of fair process based on investigatory policy alone.

Before evaluating Boermeester's argument, we add some context missing from his discussion. The *Allee* court found that the investigator did not conduct a thorough investigation due to what it perceived as premature credibility determinations. (*Allee*, *supra*, 30 Cal.App.5th at p. 1070.) For example, the investigator seemed to have "rejected . . . almost immediately" the accused's initial statement that the victim had a strong motive to frame him "despite investigative leads . . . that, if pursued, would lend support to Doe's theory, and weaken Roe's credibility. This was symptomatic of a larger problem with Dr. Allee's investigation. She did not follow up with presumably identifiable and available witnesses . . . who might have filled in holes in the investigation, thus providing a fuller picture from which to make the all-important credibility determination." (*Ibid*.) The court then concluded that "[d]eficiencies such as these are virtually unavoidable in USC's system, which places in a single individual the overlapping and inconsistent roles of investigator, prosecutor, fact finder, and sentencer." (*Ibid*.) That system is no longer in place. The investigation in *Allee* was conducted under a pre-2016 version of USC's policy.[6] The investigation in this case was conducted pursuant to USC's Misconduct Policy adopted August 22, 2016.

Under the August 2016 policy, USC provides the parties with the procedural protection of a right to a "fair, thorough, reliable, neutral and impartial investigation" by a trained

---

[6] The misconduct in *Allee* occurred in 2015. (*Allee*, *supra*, 30 Cal.App.5th at p. 1058.) Likewise, the policy in effect in 2013 when the misconduct occurred in *Doe v. University of Southern California*, *supra*, 246 Cal.App.4th at p. 235, is no longer in effect.

investigator.  USC requires its Title IX Coordinator "to oversee prohibited conduct reports and investigation to ensure timely resolution and compliance with Title IX and [USC's] policy."  To be clear, the Title IX Coordinator is not the same individual as the Title IX Investigator.  Thus, while the investigator in this case had discretion in her investigation, she had guidelines to follow in conducting her investigation and was subject to oversight.  This is not the "unfettered discretion" to investigate which the *Allee* court disapproved.

Further, unlike the investigation in *Allee*, the investigation in this case was thorough.  Boermeester does not identify any avenues left uninvestigated.

While it is possible that a specific combined investigator-adjudicator process could be structured in an unfair manner, a holding that a combined investigator-adjudicator process can never be fair would be inconsistent with current California law, which has recognized that a combined investigatory and adjudicative model does not, without more, deprive an accused student of a fair hearing.  (*Doe v. Westmont College* (2019) 34 Cal.App.5th 622, 637 [combining investigative and adjudicative functions does not, without more, deprive a student accused of sexual misconduct of a fair hearing]; *Doe v. University of Southern California, supra,* 29 Cal.App.5th at p. 1235, fn. 29 [and cases cited therein] [although investigator held dual roles as the investigator and adjudicator, the combination of investigative and adjudicative functions does not, without more, constitute a due process violation].)  Indeed, the *Allee* opinion acknowledges that this is the law.

24

Federal courts are divided on this issue. As the First Circuit explained, this system has been called "inquisitorial. See Inquisitorial System, Black's Law Dictionary (11th ed. 2019) (defining 'inquisitorial system' as a 'system of proof-taking used in civil law, whereby the judge conducts the trial, determines what questions to ask, and defines the scope and the extent of the inquiry'). No doubt, this model of justice is not the one our founders chose for criminal trials. [Citations.] But this is not to say that the inquisitorial model is constitutionally inadequate in all settings. In fact, we consider the inquisitorial model fair enough for critical administrative decisions like whether to award or terminate disability benefits. See *Sims v. Apfel*, 530 U.S. 103, 110–11, 120 S.Ct. 2080, 147 L.Ed.2d 80 (2000) (explaining that Social Security proceedings are inquisitorial rather than adversarial)." (*Haidak v. University of Massachusetts-Amherst* (1st Cir. 2019) 933 F.3d 56, 68.) On the other hand, some courts have condemned the inquisitorial approach. (*Doe v. Baum* (6th Cir. 2018) 903 F.3d 575, 581–585.)

As the California Supreme Court has noted, federal law in this specific area is "still evolving." (*Boermeester*, *supra*, 15 Cal.5th at p. 91.) Recent proposed amendments to 2020 regulations, which are not yet final, "provide that universities may opt 'to conduct live hearings with cross-examination or have the parties meet separately with the decisionmaker and answer questions submitted by the other party when a credibility assessment is necessary.' (87 Fed. Reg. 41390, 41397 (July 12, 2022).) After reexamining its position and evaluating relevant case law, the [United States Department of Education's Office for Civil Rights (OCR)] determined that 'neither Title IX nor due process and fundamental fairness' (87 Fed. Reg., *supra*, at

25

p. 41505) requires universities 'to provide for a live hearing with advisor-conducted cross-examination in all cases' (*id.* at p. 41507).  The OCR further justified the proposed amendments by stating that growing evidence calls into question 'whether adversarial cross-examination is the most effective tool for truth-seeking in the context of sex-based harassment complaints involving students at postsecondary institutions' and shows that 'information-gathering approaches such as questions asked in individual meetings instead of during a live hearing (sometimes described as inquisitorial procedures) are more likely to produce the truth than adversarial methods like cross-examination.' (*Ibid.*)" (*Boermeester, supra,* 15 Cal.5th at p. 92.)[7]

---

[7]    Specifically, "studies have found that information-gathering approaches such as questions asked in individual meetings instead of during a live hearing (sometimes described as inquisitorial procedures) are more likely to produce the truth than adversarial methods like cross-examination. These studies 'suggested that inquisitorial procedures may result in the presentation of more accurate and less biased information.' Mark R. Fodacaro et al., *Reconceptualizing Due Process in Juvenile Justice: Contributions from Law and Social Science,* 57 Hastings L.J. 955, 982, 982 n.165 (2006) (citing E. Allan Lind & Tom R. Tyler, *The Social Psychology of Procedural Justice* 25 (1988)); *see also* Christopher Slobogin, *Lessons from Inquisitorialism,* 87 S. Cal. L. Rev. 699, 711 (2014).  Because non-adversarial information gathering approaches tend to reduce opportunities for bias, researchers have found that such methods are 'most likely to produce truth.'  John Thibaut & Laurens Walker, *A Theory of Procedure,* 66 Calif. L. Rev. 541, 547 (1978)." (Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance, text and legal analysis, 87 Fed.Reg. 41390, 41507 (July 12, 2022).)

California law is also developing.  The Legislature recently enacted Senate Bill No. 493 (2019–2020 Reg. Sess.), which "is intended 'to account for the significant individual civil consequences faced by respondents alleged to have committed sexual violence as well as the significant harm to individual complainants and to education equity more generally if sexual violence goes unaddressed.'  (Stats. 2020, ch. 303, § 1, subd. (n).)  As relevant here, it gives universities the discretion to decide whether 'a hearing is necessary to determine whether any sexual violence more likely than not occurred.'  (Ed. Code, § 66281.8, subd. (b)(4)(A)(8), added by Stats. 2020, ch. 303, § 3.)"  (*Boermeester, supra,* 15 Cal.5th at p. 91.)  Senate Bill No. 493 also provides "the investigation and adjudication of alleged misconduct under this section is not an adversarial process between the complainant, the respondent, and the witnesses, but rather a process for postsecondary institutions to comply with their obligations under existing law." (Ed. Code, § 66281.8, subd. (b)(4)(A)(i).)  Thus, nothing in Senate Bill No. 493 suggests the California Legislature views the inquisitorial method as insufficient to address the interests of the parties to a sexual violence complaint, and the interests of the university community.

Senate Bill No. 493 is also consistent with the California Supreme Court's explanation that "[w]here it applies, the common law doctrine of fair procedure requires private organizations to provide adequate notice of the charges and a meaningful opportunity to be heard.  [Citations.]  We have never held, however, that any specific or baseline procedures must be followed to satisfy these requirements. . . .  'It may be satisfied by any one of a variety of procedures which afford a fair opportunity

27

for an applicant to present his position.' [Citation.]  In fact, we have observed that a formal hearing is not required in all circumstances; at times, it may be sufficient for a private organization to allow only a written response to the charges. [Citation.]" (*Boermeester, supra,* 15 Cal.5th at p. 90.)

The Supreme Court has made it clear that private " 'associations themselves should retain the initial and primary responsibility for devising a method which provides an applicant adequate notice of the "charges" against him [or her] and a reasonable opportunity to respond.' " (*Boermeester, supra,* 15 Cal.5th at p. 90.)  The California Supreme Court concluded it "is therefore appropriate to give private universities broad discretion in formulating their disciplinary processes to ensure that they not only provide the accused student a meaningful opportunity to be heard, but also embolden victims to report incidents of sexual misconduct or intimate partner violence, encourage witnesses to participate in the disciplinary process, and allow the private university to conserve its resources so that it can remain focused on its primary mission of providing a postsecondary education." (*Id.* at p. 93.)  Nothing in this discussion calls into question the combined investigator-adjudicator model or a private university's determination that it best meets all the competing needs of a student disciplinary proceeding.

Of course, it is possible that a university will select a procedure which is inherently unfair, or that university personnel will not act fairly.  Here, Boermeester contends that investigator and adjudicator Helsper did not act fairly.  To show unfairness, he repeats many of his claims made in connection with lack of substantial evidence argument claim, all but one of which related

28

to the investigator's credibility determinations.[8]  We reject these claims for the reasons set forth in our discussion of substantial evidence, above.[9]

The only new and different claim of unfairness in this section is Boermeester's contention that several of the witnesses, even critical witnesses like Peter Smith and MB2, were only interviewed by the investigator by phone, not in person. Boermeester contends this practice contravened USC's policy, which "requires the Investigator to personally see and hear all parties and witnesses to the investigation, putting him/her in the best position to make determinations as to credibility and relevance."  He contends conducting interviews by phone precludes accurate identification of witnesses and evaluation of whether their accounts are credible.  The record cite provided by Boermeester is from the report of the Title IX Appeals Panel. USC's policy does not prohibit telephonic interviews. Boermeester has forfeited any claim about identification by failing to develop an argument supported by legal authorities or cogent reasoning showing that telephonic interviews are more

---

[8]     To the extent we did not address the investigator's response to Boermeester's statements concerning his "own thoughts [and] feelings," we find that the investigator simply and correctly found that "intent was irrelevant under USC's policy against intimate partner violence." (*Boermeester*, *supra*, 15 Cal.5th at p. 97.)

[9]     We note Boermeester also claims the investigator "disregarded the parties' own written submissions entirely, except to bolster her own unsupported opinion that [Roe] is a victim of domestic violence."  This is simply a claim that the investigator was biased against him.  We rejected that claim in our first opinion.

susceptible to misidentification than in-person interviews. (*United Grand, supra,* 36 Cal.App.5th at p. 153.) Boermeester has likewise forfeited his claim that credibility determinations cannot be made without viewing the person speaking. (*Ibid*.) Further, Boermeester's claim concerning the need to observe a witness's countenance is inconsistent with Boermeester's repeated claims that Roe's written statements (which offer no opportunity to see or hear Roe) should be treated as more credible than her oral statements.

D. *Boermeester Received Considerable, Adequate Appellate Process.*

Again echoing *Allee*, Boermeester contends that USC offers students only a limited appeal right, and the " 'harm to fundamental fairness created by USC's system is amplified by the limited review of the investigator's factual findings available in the university's appellate process.' [(*Allee, supra,* 30 Cal.App.5th at 1069.)]" Boermeester describes USC's appellate processes in this case as identical to the process described in *Allee*.

As the Court of Appeal which decided *Allee* has now made clear: "We did not hold [in *Allee*] that the student had been entitled to any particular administrative appellate procedure. Rather, we merely relied on limitations of the [T]itle IX appellate procedure to support our holding that on the record before us, additional safeguards were required in the underlying factfinding process." (*Alpha Nu Assn. of Theta XI v. University of Southern California* (2021) 62 Cal.App.5th 383, 421–422.) One of those limitations, the inability to cross-examine witnesses, is not relevant to *Boermeester*. We have found that the investigative procedure provides adequate safeguards in the form of supervision by the Title IX coordinator. Thus, the relationship

30

between appellate procedure and the underlying factfinding process is not the same as the one considered by the court in *Allee*.

In addition, as Justice Wiley pointed out in his dissent to the prior opinion in this matter, the amount of process Boermeester received was "considerable." USC's process involved four layers of review, three of which were appellate. "First was the investigation. Upon concluding the extensive investigation, the investigator determined Boermeester was responsible for intimate partner violence. [¶] The second layer was a separate panel. The sanctions panel reviewed the record and decided to expel Boermeester. [¶] The third layer was the Misconduct Appellate Panel. Boermeester appealed to this separate panel. Pages 494 and 495 of the Administrative Record spell out the duties of this Misconduct Appellate Panel. These rules empowered the Misconduct Appellate Panel to decide whether substantial evidence supported the investigator's fact finding. The Misconduct Appellate Panel also was to determine whether this fact finding supported the investigator's conclusions about policy violations. [¶] This Misconduct Appellate Panel exercised independent judgment. It recommended a two-year suspension rather than expulsion for Boermeester. [¶] The fourth layer was USC's Vice President for Student Affairs, who was USC's final decisionmaker on student discipline. This USC Vice President overruled the Misconduct Appellate Panel's recommendation and determined the appropriate sanction was expulsion."

As the dissent also pointed out, Boermeester then "applied for a fifth layer of review by filing in the superior court. He was granted that review. Boermeester then sought and obtained a sixth and seventh layer of review, in this court and the Supreme

31

Court. At the time of our prior opinion (and of *Allee*), it was not settled law that writ review of USC's disciplinary proceedings would be available. The Supreme Court held, as a matter of first impression, writ review pursuant to Code of Civil Procedure section 1094.5 is appropriate for a private university's disciplinary hearing. (*Boermeester, supra,* 15 Cal.5th at p. 86.) We conclude the adjudicatory process was adequate.

## DISPOSITION

The judgment is affirmed.

**CERTIFIED FOR PUBLICATION**


STRATTON, P. J.


We concur:



WILEY, J.




VIRAMONTES, J.